**STATE of Utah, Plaintiff and Appellee,**

v.

**Shannon Glen WINWARD, Defendant and Appellant.**

**No. 960274–CA.**

Court of Appeals of Utah.

June 12, 1997.

Edward K. Brass, Salt Lake City, for Defendant and Appellant.

Jan Graham and Barnard N. Madsen, Salt Lake City, for Plaintiff and Appellee.

Before WILKINS, Associate P.J., and BILLINGS and ORME, JJ.

## OPINION

ORME, Judge:

Appellant Shannon Glen Winward challenges a jury verdict finding him guilty of four counts of sodomy on a child, a first degree felony, in violation of Utah Code Ann. § 76–5–403.1 (1995), and one count of sexual abuse of a child, a second degree felony, in

violation of Utah Code Ann. § 76–5–404.1(1) (1995).

Appellant raises three claims of error. Two claims concern prosecutorial misconduct: (1) failure of the prosecutor to present evidence in support of the prejudicial innuendo in his cross-examination of appellant and (2) improperly commenting on appellant's exercise of his constitutional rights to the assistance of counsel and to remain silent. Appellant's third claim is that he received ineffective legal assistance at trial. We affirm.

## FACTS

Although we present some conflicting evidence as it pertains to the issues appellant has raised on appeal, for the most part "[w]e recite the facts in the light most favorable to the jury's verdict." *State v. Cosey*, 873 P.2d 1177, 1178 (Utah.Ct.App.), *cert. denied*, 883 P.2d 1359 (Utah 1994). *Accord State v. Hamilton*, 827 P.2d 232, 233 (Utah 1992).

### A. Background

In May 1995, appellant was brought to trial on charges that he sodomized his girl-friend's two boys, T.W., age eight, and R.W., age ten, and sexually abused a neighbor boy, A.F., age six.[1] There was no physical evidence of sexual abuse. The only evidence of sodomy and sexual abuse came from the testimony of the three boys. A.F. testified that, one Friday morning before school, appellant, while baby-sitting A.F., pulled down A.F.'s pants and fondled the six year-old's penis and anus.

On the following Sunday night, A.F. told his mother that appellant had played with his private parts, and she called the police, who came to A.F.'s house and interviewed him that night. On Tuesday, A.F.'s mother called R.W. and T.W.'s mother and told her about A.F.'s accusations against appellant. A.F.'s mother testified that, after this discussion, R.W. and T.W.'s mother "grounded" them. R.W. testified that his mother told

him and T.W. they were not to talk to anyone about it.

After A.F. talked with the police, a detective and a social worker went to the boys' school to interview R.W. and T.W. The older R.W. told them that appellant repeatedly sexually abused him over the past four years. However, the younger T.W. told the police "everything was a lie." At trial, he testified that he said this because he was afraid he "might go to jail" because he was being interviewed by a policeman, and "policeman take people to jail." T.W. then provided the jury with details of appellant's almost daily sexual abuse over the previous four years. At trial, T.W. and R.W. each gave explicit testimony about how appellant anally and orally sodomized them, rubbed their penises, and forced them to orally sodomize each other and to rub each other's penises.

T.W. testified that he had told his mother that appellant was "being mean" and "hurting" them, because he didn't then know the words "sexual abuse." R.W. testified that he told his mother many times, beginning within a day or two after the first instance, that appellant was molesting them, but she did nothing to prevent the abuse or to protect her children from appellant.

Appellant denied ever sodomizing the boys or molesting them in any way. He testified that he had never been convicted of any crimes. Two of appellant's friends, who had seen T.W. and R.W. interact with appellant many times, testified that neither boy expressed any fear of, or problems with, appellant. Also, the medical examinations of both T.W. and R.W. showed no physical evidence of the abuse claimed. However, the State's expert, who had examined R.W. and T.W., testified that she could not rule out sexual abuse because, in cases of anal sodomy of children, use of lubricants and normal bowel functioning can mitigate damage, and some injuries to the rectal area heal quickly. The expert also testified that, in cases of oral sodomy and genital rubbing, she generally would not expect to see any physical indication of abuse.

---

1. This trial was appellant's second jury trial. The jury was unable to reach a unanimous verdict in the first trial.

### B. Facts Regarding Challenged Cross-examination/Innuendo

During direct examination, appellant responded to his counsel's questions concerning the time he first heard about R.W.'s and T.W.'s accusations. Appellant stated that he first heard the accusations at a juvenile court hearing.

In cross-examining appellant, the prosecutor further explored when appellant first heard about the boys' accusations. In the course of this examination, appellant referred to the juvenile court as a "kangaroo court." The prosecutor elicited testimony concerning this characterization. He also established that appellant was only allowed to go to the first hearing in juvenile court but was not allowed at further proceedings because he had neither biological nor marital ties to the boys' family. The prosecutor also inquired about appellant's intentions to marry the boys' mother. Appellant responded that they had talked about marriage. Appellant then stated that he wanted to get married, but would not "marry her until this is taken care of." The prosecutor then asked, "But in the meantime she gave up her boys, right?" [2]

Appellant's counsel objected and requested to have the jury excused. The court excused the jury, whereupon appellant's counsel moved for a mistrial based on prosecutorial misconduct. Appellant's counsel argued that the prosecutor's question had put before the jury, in an inadmissible form, information suggesting that T.W. and R.W.'s mother had surrendered custody of her sons to the State.

2. The exact exchange between the prosecutor and appellant, summarized in the text, is as follows:

Q  You indicate that you first heard of the accusations regarding you on the 17th. Can you tell us the circumstances surrounding that? Was that when you went to court?
A  Yes, it was.
Q  That's the first you ever heard that the boys were saying you had done something to them that involved sexual matters?
A  That's the first time I heard [R.W.] was, yes. Well, I kind of heard [T.W.] was, but that was later.
Q  Did you talk to the boys at that time?
A  No, the only time I saw them was in court.
Q  You didn't talk to them at any time in court?
A  Not in that court. These courts is the only one I have been allowed to see them in.
Q  When you say "that court," you're talking about juvenile court?
A  Yes, I'm talking about family court, kangaroo court.
Q  You seem to have a very strong opinion about that.
A  Oh, yes.
Q  What does that come from?
A  Dealings with it.
Q  Since you're not a parent of these boys, why would you ever have to do anything at all with juvenile court? Did they summons you in?
A  No, they wouldn't.
Q  So you wanted to be involved but they wouldn't let you?
A  Yes.
Q  That's why you're unhappy about that?
A  Yes.
Q  Okay. Is that all there is to that feeling, that it's a kangaroo court?
A  I don't understand.
Q  Well, you referred to it [a]s a kangaroo court. Is that right?
A  Yes.
Q  You feel very strongly that they are not doing what they're supposed to do or something like that?
A  They listen to the state and the state only.
Q  And you have been present at many hearings where that's occurred?
A  I have been present?
Q  Yes.
A  I was only at the first one and that kind of said it all right there.
Q  You went one time on the 17th of May of 1993, and you formed your opinion about the juvenile court system from that one hearing?
A  They wouldn't let me go to anymore.
Q  They told you to stay away?
A  Yes.
Q  Because you're not any relation to these boys or their mother, is that right?
A  There's no biological ties; yes, that's the reason why.
Q  They're not marriage ties, either; are there?
A  At that point in time, no, we were just starting to talk about it.
Q  Are there now?
A  I don't know.
Q  You don't know your own marital status?
A  I'm single right now.
Q  Okay.
A  I want to be married. I've wanted to be married.
Q  You want to marry [the boys' mother]?
A  Yes.
Q  But [she] won't marry you until this is all taken care of?
A  No, I won't marry her until this is taken care of.
Q  But in the mean time she gave up her boys, right?

He further argued that the question unfairly bolstered the boys' credibility since they had testified they had told their mother about the molestation, and she had done nothing. Appellant's counsel argued that a limiting instruction was insufficient and a mistrial was the only appropriate remedy. Finally, he argued that the question was beyond the scope of direct examination and that the prosecutor had created the issue and was not merely addressing something appellant had raised.

The prosecutor responded that his line of questioning legitimately followed up on the relationship of the parties which appellant had raised during direct examination. The prosecutor proposed that if the court deemed the question inappropriate, he could withdraw it, and the court could give a limiting instruction at appellant's option. The prosecutor then conceded that, "[w]hether or not an absent witness gave up her children I suppose could be deemed irrelevant at this point."

The trial court denied the motion for mistrial, but sustained the objection and gave a curative instruction proposed by the defense. Before the jury returned, appellant's counsel explicitly renewed his motion for mistrial.

## C. Facts Pertaining to Challenged Cross-examination and Argument Concerning Constitutional Rights

On direct examination, appellant was asked whether he had been interviewed prior to being arrested. Appellant testified that no one had interviewed him.

During cross-examination, the prosecutor pursued appellant's response that nobody had ever interviewed him about this case. The prosecutor asked appellant if Detective Mitchell had ever interviewed him. Appellant admitted that Detective Mitchell asked to talk with him after he had been arrested. However, appellant testified that he told the detective that he would only talk with the detective if his lawyer were present, and appellant "never heard from him again." The prosecutor followed up by asking appellant if the reason that nobody interviewed him was that he "wanted to be interviewed only in a certain way and that never happened." Appellant disagreed and explained that he was never interviewed by the detective before the arrest because they worked different schedules, and neither was willing to work with the other to set up an interview. Appellant testified that the first time he met Detective Mitchell was in jail.

At this point, the prosecutor rephrased his earlier question, asking if appellant had wanted to be interviewed "only under certain conditions." Appellant responded that he wanted to have his lawyer there to protect his rights. The prosecutor acknowledged that that was "fine and appropriate," and then, after reconfirming the previous question, asked appellant whether the detective ever talked with appellant's lawyer.[3] Appel-

---

**3.** The entire exchange between the prosecutor and appellant, up to the time when appellant's counsel interposed the relevance objection, is as follows:

Q I wanted to ask you about one further thing you said, and I believe I wrote this down exactly as you said it. You said that no one had ever interviewed you about this from the 14th of May onward? Is that correct? Is that what you said?

A That's what I said.

Q Detective Mitchell talked to you, didn't he?

A When I had been arrested, he asked me if I wanted to talk to him. I said, "Sure, as soon as my lawyer is here." I never heard from him again.

Q So would it be fair then to state, sir, that the reason nobody interviewed you is because you said that you wanted to be interviewed only in a certain way and that never happened?

A No, for the first couple of weeks afterwards, according to [appellant's girlfriend], he did try and call a couple of times. [She] told him I worked until 5:30 at night and that he got off at 5:30 and was not willing to wait and call me or talk to me.

Q So you mean Detective Mitchell was calling your house and talking to [her] for two or three weeks before you got arrested?

A He called what?

Q Is that—.

A Before? No, after. He went on vacation, and they took—they kidnapped the boys out of school on Friday. He went on vacation the following week, and wasn't there for a whole week. We couldn't do nothing. Everything was—at this time, was happening on Friday, and the next week he called and I was at work. I worked ten hour days. I got home exactly at 5:30. He left at 5:30. He would not call.

lant's counsel objected as to relevance, and the prosecutor said: "And I agree. We'll move on. The interview never happened, though; right?" Appellant answered, "No."

In closing argument, the prosecutor referred to the above cross-examination as follows:

The defendant said on cross-examination that—no, he said it first on direct examination, and then I asked him about it on cross-examination, that no one really tried to interview him.

But on cross-examination, perhaps a different view of what exactly he meant by that came out, and you have to decide what he meant when he said that nobody tried to interview him.

Is it possible that he has some misconception about what the detective was going to do after he said he wanted to have his lawyer present? He certainly didn't put his lawyer on the stand to testify, so you have to fill in the blanks yourself.

But that statement about, "No one ever tried to interview me," I think is misleading. Maybe you think it's not misleading. It's not what I think that's important, though; it's what you think.

Appellant did not object to the prosecutor's closing argument before the jury returned its verdict. After the jury convicted appellant on all counts, appellant moved for a new trial and a certificate of probable cause, raising the same issues presented in this appeal. The trial court denied the motions summarily. This appeal followed.

## CROSS-EXAMINATION/INNUENDO

Appellant first argues that it was knowing misconduct for the prosecutor to ask him on cross-examination whether the mother of his

Q So you knew that somebody named "Detective Mitchell" wanted to talk to you, but you couldn't get together with him?
A He wouldn't work with me to get together with him.
Q That was on the phone, right?
A Yes.
Q Did you ever talk to him on the phone? Was it always [your girlfriend]?
A No, I was always at work. I never talked to him. The first time I met him was in jail.
Q That's when you met him face to face?

two primary victims had given up custody of her sons. He claims that a new trial is required because the prosecutor failed to present any evidence supporting this insinuation. Appellant further contends that the unsubstantiated innuendo prejudiced his case because his defense relied almost exclusively on his credibility.

"Generally, the test used for determining whether a prosecutor's statements are improper and constitute error is whether the remarks ' "called to the jurors' attention matters which they would not be justified in considering in reaching a verdict." ' " *State v. Emmett,* 839 P.2d 781, 785 (Utah 1992) (footnote and citations omitted). "[I]t is error to ask an accused a question that implies the existence of a prejudicial fact unless the prosecution can prove the existence of that fact. Otherwise, the only limit on such a line of questioning would be the prosecutor's imagination." *Id.* at 786–87 (footnote omitted). *See also United States v. Silverstein,* 737 F.2d 864, 868 (10th Cir.1984) (concluding that "a prosecutor who asks the accused a question that implies the existence of a prejudicial fact must be prepared to prove that fact"). Put another way, "[i]t is improper conduct for the Government to ask a question which implies a factual predicate which the examiner knows he cannot support by evidence or for which he has no reason to believe that there is a foundation of truth." *United States v. Harris,* 542 F.2d 1283, 1307 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977).

Appellant argues that this challenged question called to the attention of the jury a matter it was not justified in considering. Appellant argues that the prosecutor did not

A That's the first time I met him and talked to him or anything.
Q You said that you wanted to talk to him only under certain conditions?
A Well, I figured if you're in jail, you want to have your lawyer present there to protect your rights.
Q Well, that's certainly fine and appropriate. I'm asking: Is that what happened?
A Yes.
Q Do you know whether Detective Mitchell ever talked to your lawyer?

have any competent witnesses at hand to present this evidence, and for this reason we should order a new trial. Appellant's argument is wide of the mark. As the authorities just cited suggest, the prosecutor does not have to establish a fact before he can ask about it. It is enough that the prosecutor has reason to believe a fact is true and has the *ability* to establish the fact. In the instant case, it is undisputed that at the time the prosecutor inquired, the boys' mother had in fact relinquished custody of the boys in the juvenile court proceeding. There is no basis in the record for concluding this important development had somehow escaped the prosecutor's attention and that he got lucky with a wild guess. On the contrary, appellant's girlfriend testified at his first trial that she had agreed to give up custody of her boys. Juvenile court documents, admitted into evidence at appellant's first trial, demonstrated that appellant's girlfriend admitted to the allegations in the termination petition and gave up custody of her children.

Accordingly, the prosecutor had "reason to believe that there [was] a foundation of truth" for his question, *Harris,* 542 F.2d at 1307, and thus asking the question was not fatal. Because the prosecutor had a good faith basis to believe the truth of the fact about which he inquired, could readily have established the fact through juvenile court documents or knowledgeable witnesses, and had every reason to assume appellant was competent to answer the challenged question,[4] we find no prosecutorial misconduct in this regard.[5]

### CROSS-EXAMINATION AND ARGUMENT CONCERNING CONSTITUTIONAL RIGHTS

Appellant next argues that the prosecutor's cross-examination and closing argument

concerning appellant's exercise of his constitutional rights to remain silent and to an attorney require a new trial. On cross-examination, the prosecutor pursued appellant's comment made during direct that he had never been interviewed about the boys' allegations until he was arrested. During the now-challenged cross-examination, appellant objected once, citing irrelevance, after which the prosecutor withdrew the question. Appellant did not, thereafter, request a curative instruction or move for a mistrial. Later, during the prosecutor's closing argument, appellant did not object, request a curative instruction, or move for a mistrial. Appellant moved for a new trial on this ground only after the jury had returned with guilty verdicts.

■■■ "'[A] contemporaneous objection or some form of *specific* preservation of claims of error must be made a part of the trial court record before an appellate court will review such claims on appeal.' Importantly, the grounds for the objection must be distinctly and specifically stated." *State v. Johnson,* 774 P.2d 1141, 1144 (Utah 1989) (quoting *State v. Tillman,* 750 P.2d 546, 551 (Utah 1987)). "Failure to object to improper remarks will constitute a waiver of the claim, unless the remarks constitute plain error." *State v. Emmett,* 839 P.2d 781, 785 (Utah 1992). Additionally, the tactical decision not to object, thereby foregoing a ruling or instruction that may cure an error, constitutes knowing waiver, and we will decline to consider the claim of plain error in such instances. *See State v. Bullock,* 791 P.2d 155, 158–59 (Utah 1989), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990).

■■■ Although appellant objected to one question during the prosecutor's cross-examination, the grounds he now raises on appeal

---

4. Appellant was a member of the boys' household and attended one of the juvenile court proceedings regarding their custody. He claimed to have an ongoing relationship with their mother. Also, appellant heard the boys' mother testify at his first trial that she had agreed to give up custody of the boys.

5. We therefore do not reach the question of whether the challenged conduct was prejudicial. *See State v. Cummins,* 839 P.2d 848, 852 (Utah. Ct.App.1992). Furthermore, appellant did not argue, pursuant to Rule 403 of the Utah Rules of Evidence, that the prosecutor's challenged question, although relevant, was unduly prejudicial.

were not distinctly stated to the trial court.[6] Thus, the prosecutor's alleged errors on cross-examination were not preserved for our review unless they can be reached under the plain error doctrine. In general, to establish plain error, the appellant must show the following: "(i) An error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). "In instances where an error does not impact a federal constitutional right, the test used for determining an error's harmfulness is whether there is a reasonable likelihood that absent the error a different result would have occurred." *Emmett*, 839 P.2d at 784. *Accord State v. Verde*, 770 P.2d 116, 120 (Utah 1989).

### A. Cross-examination

On cross-examination, the prosecutor did not overstep his bounds in clarifying appellant's statement on direct that no one had ever interviewed him. It was proper for the prosecutor to attempt to counter the implication from appellant's testimony that he had never been interviewed in spite of his eagerness to tell his story. "If [a defendant] takes the stand and testifies in his own defense[,] his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination." *Brown v. United States*, 356 U.S. 148, 154–55, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958). A defendant, however, is not subject to cross-examination " 'merely to prejudice the jury against the defendant.' " *State v. Tucker*, 800 P.2d 819, 822 (Utah.Ct. App.1990) (quoting *United States v. Pennix*, 313 F.2d 524, 528 (4th Cir.1963)). In the instant case, appellant had " ' "no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." ' " *Tucker*, 800 P.2d at 823 (citations omitted). *See also State v. Saunders*, 893 P.2d 584, 591 (Utah.Ct.App.) (where defendant opens the door on direct examination, state is entitled to elicit clarifying information), *cert. granted*, 910 P.2d 425 (Utah 1995). During the challenged cross-examination, the prosecutor did not mention appellant's exercise of his right to silence but did comment on his exercise of his right to counsel, and in fact endorsed the right.[7] The prosecutor never stated or implied that appellant's exercise of his right to refuse to be interviewed without counsel was suggestive of guilt. *Cf. State v. Sorrels*, 642 P.2d 373, 376 (Utah 1982) (per curiam) (in affirming conviction, Court stated " '[i]t is significant that there is no indication that the prosecutor made any attempt to use [appellant's invocation of his rights] to cast any inference of guilt on the defendant, nor to persuade the jury to do so' ") (quoting *State v. Urias*, 609 P.2d 1326, 1328 (Utah 1980)).

Thus, the prosecutor's inquiry about the interview problems was simply not error, and the first requirement of the plain error doctrine was not satisfied.

### B. Closing Argument

The prosecutor's statements in closing argument went further and may well have exceeded the limits of permissible comment on appellant's right to counsel. The reference to appellant not "put[ting] his lawyer on the stand to testify" is, at the very least, bizarre.[8] However, we decline to address the propriety of the prosecutor's closing argument because appellant made a

---

Accordingly, we have no occasion to consider that question.

6. The only ground for appellant's objection during trial was relevance.

7. To reiterate, the pertinent exchange between the prosecutor and appellant was as follows:
   Q  You said that you wanted to talk to [Detective Mitchell] only under certain conditions?
   A  Well, I figured if you're in jail, you want to have your lawyer present there to protect your rights.

Q  Well, that's certainly fine and appropriate.

8. Although this and other phrases in the argument have a questionable ring to them, the thrust of the argument was not that the jury should draw some inference from appellant's invocation of his right to counsel; rather, the theme was that appellant's account of pre-arrest events was not credible.

conscious tactical decision not to object and obtain a curative instruction at trial, thus waiving the right to review. *See generally State v. Bullock,* 791 P.2d 155, 158 (Utah 1989).

Appellant contends that the challenged prosecutor's closing remarks constitute plain error.

> However, we do not appraise all rulings objected to for the first time on appeal under the plain error doctrine. For example, if trial counsel's actions amounted to an active, as opposed to a passive, waiver of an objection, we may decline to consider the claim of plain error.... [I]f a party through counsel has made a conscious decision to refrain from objecting or has led the trial court into error, we will then decline to save that party from the error.

*Id.* at 158. Appellant concedes on appeal that his attorney made a tactical choice not to object during the prosecutor's closing so as not to reinforce "the notion put forth by the prosecutor's argument, that [appellant] and his attorney were hiding something from the jury." However, "[a]n objection lodged outside the hearing of the jury and after the prosecution's closing arguments would not have drawn the jury's attention to the questionable remarks, and it would have alerted the court to the advisability of instructing the jury to draw no adverse inferences." *State v. Hales,* 652 P.2d 1290, 1292 (Utah 1982).

Thus, appellant's decision, however sound tactically, not to lodge a timely objection that would have allowed the trial court "to mitigate any damage done by the prosecutor's comments" forecloses our review of the alleged error even under a "plain error" rubric. *Id. See also State v. Zimmerman,* 78 Utah 126, 130, 1 P.2d 962, 964 (1931) (holding unreviewable, in absence of objection before verdict, trial judge's remark to jury that he could see no reason why jurors could not agree on verdict).

## INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, appellant argues that his counsel's failure to object to the prosecutor's closing argument constitutes ineffective assistance of counsel. We disagree.

In order to bring a successful ineffective assistance of counsel claim, appellant must show that his trial counsel's performance was deficient, in that it "fell below an objective standard of reasonableness," and that the deficient performance prejudiced the outcome of the trial. *Strickland v. Washington,* 466 U.S. 668, 687–88, 693, 104 S.Ct. 2052, 2064, 2067, 80 L.Ed.2d 674 (1984). *Accord State v. Garrett,* 849 P.2d 578, 579–80 (Utah. Ct.App.), *cert. denied,* 860 P.2d 943 (Utah 1993).

First addressing the prejudice element, even had appellant's counsel objected, it is unlikely that the outcome would have been different. *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69; *Garrett,* 849 P.2d at 580. If appellant's counsel had objected, the trial court would have had the opportunity to issue a curative instruction, which is ordinarily presumed on appeal to be effective. *See Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987); *State v. Menzies,* 889 P.2d 393, 401 (Utah 1994), *cert. denied,* 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995). Thus, even if the objection had been interposed, we cannot conclude the outcome would have been different.

In any event, we would be hard-pressed to conclude that appellant's counsel performed deficiently at trial. To prevail on a claim of ineffective assistance, appellant must demonstrate " 'that counsel's actions were not conscious trial strategy,' " *Garrett,* 849 P.2d at 579 (quoting *State v. Ellifritz,* 835 P.2d 170, 174 (Utah.Ct.App.1992)), and "that there was a 'lack of any conceivable tactical basis' for counsel's actions." *Id.* (quoting *State v. Moritzsky,* 771 P.2d 688, 692 (Utah.Ct.App.1989)). Although we noted that a timely objection before verdict would have allowed the trial court to mitigate any damage done by the prosecutor's comments, appellant's counsel has identified sound tactical reasons for not objecting notwithstanding traditional appellate notions (some would say "fictions") about the curative powers of a curative instruction. Appellant's counsel ex-

plained that he made a tactical choice not to object during the prosecutor's closing so as not to reinforce "the notion put forth by the prosecutor's argument, that [appellant] and his attorney were hiding something from the jury." At oral argument, counsel re-emphasized his position that objecting in front of the jury during closing argument was more harmful than beneficial. Counsel also contended that curative instructions are ineffective to cure harm, even citing a study on this point.

## CONCLUSION

Because the prosecutor had reason to believe that there was a foundation of truth for his question, asking appellant on cross-examination whether the mother of his two primary victims had given up custody of her sons was not improper on the ground asserted. Also, we find no plain error in the challenged inquiry of the prosecutor concerning appellant's constitutional rights to silence and to an attorney. We also conclude that appellant knowingly waived his right to review of the challenged comments in the prosecutor's closing argument because appellant's counsel made a conscious tactical decision not to object. Finally, appellant has not established his ineffective assistance of counsel claim. Accordingly, we affirm appellant's convictions.

WILKINS, Associate P.J., and BILLINGS, J., concur.