**2017 UT App 158**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OSTON SHILOH FAIRBOURN,
Appellant.

Opinion
No. 20141149-CA
Filed August 24, 2017

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 141900233

Craig L. Pankratz and David M. Corbett, Attorneys
for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and STEPHEN L. ROTH concurred.[1]

MORTENSEN, Judge:

¶1 Defendant Oston Shiloh Fairbourn was shot three times after lunging at Officer with a seven-inch blade. A jury found Defendant guilty of attempted aggravated murder. We now consider whether Defendant's claims of prosecutorial misconduct and evidentiary error warrant reversal of his conviction. We conclude they do not and affirm.

---

1. Judge Stephen L. Roth participated in this case as a member of the Utah Court of Appeals. He retired from the court before this decision issued.

BACKGROUND

¶2     Because Defendant appeals from a jury verdict, "we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

¶3     One winter evening, Defendant started walking across a busy street without first looking either direction. His apparent disregard for his own safety caught the attention of Officer, who was on patrol in the area. Officer pulled into a nearby parking lot to further observe Defendant's behavior. Defendant eventually noticed Officer and came into the lot where the patrol car was parked. He stood at the end of the lot opposite of the car, looking at Officer for about thirty seconds. Defendant then walked away, into the middle of the street, before turning back to Officer. Believing that Defendant was trying to provoke him, Officer called for a single-officer backup, pulled his patrol car into the street to block traffic, and turned on the car's overhead lights.

¶4     Officer had stopped about twenty feet away from Defendant when he exited his patrol car. Upon Officer's exit, Defendant pulled out "a big knife" (with a seven-inch blade), which he held at his waist "with his elbow bent as if he were ready to use it." The production of the knife was accompanied by Defendant announcing that Officer was "about to fucking die." In response, Officer called for more backup, drew his firearm, pointed it at Defendant, and repeatedly ordered Defendant to drop the knife. Rather than complying with Officer's orders, Defendant began to move sideways. Officer moved parallel to him, making sure Defendant "could not attack from the side." A bystander observed that Defendant was shifting his weight from one foot to the other, "kind of dancing around."

¶5     Defendant turned and started moving quickly away from Officer, and Officer followed. Defendant abruptly stopped and

turned to face Officer again, leaving somewhere from five to twenty feet between them. He took a step toward Officer, who told him to stop. Instead, Defendant switched his grip on the knife, raised his arm so the hand holding the knife was near his head, and took another step. Officer again ordered Defendant to stop. Defendant ignored the order, lunging at Officer, and Officer responded by shooting him three times.

¶6     Defendant was charged with attempted aggravated murder, and the case went to a jury trial. Several pieces of evidence presented are relevant to this appeal. First, Defendant testified, explaining that on the night of his encounter with Officer, he was heading to a friend's house to retrieve his phone. He had been to the house only twice before and got turned around on his way. He stopped in a parking lot—the lot where Officer was parked—as he deliberated whether to continue trying to find his friend's house or instead make his way to his grandmother's house nearby. Defendant had started into the street when Officer pulled up in his patrol car. He thought about running away, uneasy because he had a knife on him that would be difficult to explain. He also considered discarding the knife but decided against it. Instead, Defendant decided to continue on toward his friend's house. He gave up on that plan when he realized he was still disoriented and turned around to face Officer. Officer ordered Defendant to show him his hands, and Defendant complied, showing Officer that he had the knife. Again being told to show his hands, Defendant raised the knife to his shoulder. According to Defendant, his actions were meant as a show of surrender; he "had no intention of harming anyone that night." The next thing Defendant remembers is waking up in a hospital.

¶7     In its brief, the State contends that while Defendant was in the hospital, Detective gave Defendant *Miranda* warnings and Defendant invoked his right to silence. But he then "continued to talk" while Detective "simply listened—for about seven minutes." The topic of Defendant's monologue was his belief when first arriving at the hospital that "he was dead" and his

feeling "that he was in hell." However, after a thorough review of the trial testimony, we found no reference to Detective giving Defendant *Miranda* warnings or of Defendant invoking his associated rights.

¶8    While cross-examining Defendant, the prosecutor asked about this conversation with Detective. He asked, "You didn't say anything to [Detective] about this misunderstanding of you trying to surrender to [Officer] when [Detective] talked to you at the hospital, did you?" Defendant answered that he had not. The prosecutor followed up with, "So today in court talking to this jury here, nine months after this happened is the first time that we're hearing that you were trying to surrender to [Officer], right?" Defendant answered, "Yes. I didn't say anything to [Detective]." The prosecutor then highlighted this exchange during his closing argument:

> I want to bring up three important things about the defendant's testimony that I'd like you to consider in light of these elements that you've read about in these instructions. First of all, everything that the defendant told you today, he had the chance to say before. When he was talking to [an officer] at the scene, he had an interview with [Detective] after—

The prosecutor was interrupted by Defendant's trial attorney objecting that the prosecutor was "shifting the burden of proof." The trial court stated, "I don't think it's burden shifting," and allowed the closing argument to proceed.

¶9    During the cross-examination, the prosecutor further pressed Defendant on his version of events when he asked Defendant to explain the discrepancies between his testimony and the testimony of eyewitnesses:

> [Prosecutor]: And you heard these witnesses when they told the jury that they saw you holding something, some of them said a knife but some

said holding [your] hand out in front of you as you are facing the officer, right?

[Defendant]: Yes, I heard that.

[Prosecutor]: And did you hear [another eyewitness] when he told the jury that you were holding the knife over your head, lunging and making a motion like that towards the officer?

[Defendant]: Yes, I heard him.

[Prosecutor]: So if you were trying to submit or surrender to the officer and these witnesses are perceiving something else, is it your testimony today that this is just a misunderstanding on their part?

Defendant explained that "everyone has different perspectives or [vantage] points."

¶10   Another pertinent exchange took place at trial when the prosecutor elicited testimony concerning Officer's thoughts and emotions during his interaction with Defendant. He asked what was "personally going through [Officer's] mind," and Officer explained,

> Um, lots of things. . . . I think people get into law enforcement for various reasons. For me it would be difficult to hold a desk job because I have a short attention span. And I enjoy serving people.
>
> My thoughts immediately shift towards my family. I've got people that depend on me. You know, you kind of go into a—into a—I don't know, for lack of a better term, a cop mode to where you're professional and you try and be courteous. And all that went out the window. Like it's just pure survival at that point.

I don't think I gave another radio transmission out until the aftermath of what had occurred, but yeah, for me, it's just a matter of making it home at the end of the night at that point.[2]

¶11 Finally, Officer presented what Defendant refers to as "expert testimony regarding the Twenty-one Foot Rule—a rule of thumb for officers to use when determining when they are most susceptible to a personal attack." Defendant's trial attorney had objected to this testimony, arguing that Officer's "state of

_____

2. Defendant claims that the prosecutor then showcased this testimony in closing argument, but the portion of the transcript cited deals more with Officer's ability to stay calm than his thoughts about his family and staying safe. The prosecutor reminded the jury,

> I think you can see on the stand, [he] was emotional about this situation. This is something that upset him. This is something that, um, I'm even prepared to say this caused him pause and caused him significant amount of concerns. If you remember from [the other officer] as well, when he heard [Officer] call out on the radio, testified . . . [he] could hear the stress in [Officer's] voice.

> [Officer] is somebody who [the other officer] testified he knows he's a pretty calm, collected guy and an experienced police officer. And I think you could see this from [Officer's] testimony. I mean [Officer] didn't present himself to you as someone who is high-strung. He didn't present himself to you as somebody who would get worked up about a situation that was really nothing without any sort of pause or concern. I think [Officer] presented himself to you as a pretty cool cucumber, for lack of a better word.

mind is not relevant" and that "the defendant's state of mind is what's relevant." The trial court clarified, "So I just want to make clear, your objection is relevance?" When Defendant's trial counsel answered in the affirmative, the trial court replied, "Okay. For now I'm going to sustain the objection regarding any training that he had. But if the door is opened on cross, you cross on the officer's reaction, then the door is opened." But later, outside the presence of the jury, the trial court explained, "The more I think about it, the more I think I may be in error." After receiving a proffer from Officer as to what he would say about the twenty-one-foot rule, the trial court changed its ruling: "I'm going to allow the testimony as has been articulated."

¶12    The jury deliberated for more than nine hours before returning a guilty verdict. Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶13    Defendant raises two overarching issues for our review. First, he asks us to consider whether the State engaged in prosecutorial misconduct (1) by asking Defendant about his interview with Detective, after Defendant had invoked his right to silence; (2) by asking Defendant to provide an explanation for the discrepancies between his testimony and the testimony of eyewitnesses; or (3) by asking Officer what was going through his mind when he encountered Defendant. Insofar as this issue was preserved, we will review "the trial court's rulings on prosecutorial misconduct claims for an abuse of discretion." *State v. Davis*, 2013 UT App 228, ¶ 9, 311 P.3d 538 (citation and internal quotation marks omitted). To the extent this issue was not preserved, Defendant requests that we review it for plain error. "For plain error, [Defendant] must demonstrate (i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Bond*, 2015 UT 88, ¶ 15, 361 P.3d 104 (second alteration in original) (citation and internal quotation marks omitted).

¶14    Second, Defendant asks us to consider whether the trial court improperly admitted evidence of the twenty-one-foot rule. At trial, Defendant's counsel objected that the evidence was irrelevant.[3] "A trial court has broad discretion in deciding whether evidence is relevant, and we review a trial court's relevance determination for abuse of discretion." *State v. Fedorowicz*, 2002 UT 67, ¶ 32, 52 P.3d 1194.

ANALYSIS

¶15    Defendant's challenges on appeal involve three sources of alleged prosecutorial misconduct—comments on Defendant's silence, questions about discrepancies between Defendant's and other witnesses' testimonies, and questions about Officer's mindset—and the admission of what Defendant argues was irrelevant testimony regarding the twenty-one-foot rule. We consider these four issues in turn.

---

3. On appeal, Defendant also argues that the testimony was improper expert testimony. But at trial, any objection to the expert nature of the testimony was phrased as opposition to Officer testifying to "what studies have shown or what any other officer or other officers have been instructed or anyone in the state of Utah would have been instructed if they were a peace officer." The State countered, "We don't need to talk about studies. . . . [H]e's not testifying he's an expert. He's not saying he's part of the studies or that he conducted the studies." To this, Defendant's trial counsel responded, "That would take care of my other objections[.]" Thus, Defendant represented to the trial court that any concern about improper expert evidence had been resolved. Any error in admitting what Defendant characterizes as expert evidence was invited. Because invited error precludes appellate review of an issue, s*ee State v. Maese*, 2010 UT App 106, ¶ 12, 236 P.3d 155, we do not review this issue. *See infra* ¶¶ 39-42.

## I. Prosecutorial Misconduct

¶16 Defendant acknowledges that his prosecutorial-misconduct claim "was only partially preserved." The discrete issue preserved arose during the State's closing argument, when the prosecutor brought up Defendant's failure to previously explain portions of the story that he provided while testifying at trial.[4] But the objection made on this point was that the State's closing argument "shifts the burden of proof" by suggesting that Defendant had an "obligation to come forward with evidence." The trial court questioned whether this was actually an issue of Defendant's "Fifth Amendment right to remain silent," but because defense counsel repeatedly argued that the problem was improper burden shifting, the trial court ultimately concluded, "I don't think it's burden shifting," and allowed the State to continue. Because Defendant's argument on appeal is not that the State improperly shifted the burden of proof but instead that it improperly commented on his silence, this issue was not preserved.

¶17 We are therefore left to consider Defendant's prosecutorial-misconduct claim for plain error. Our supreme court recently clarified the proper framework for appellate review of unpreserved prosecutorial-misconduct claims:

> [P]lain error review considers the plainness or obviousness of the district court's error (not the prosecutor's). That follows from the nature of our appellate jurisdiction: Appellate courts review the decisions of lower courts. We do not review the actions of counsel—at least not directly.
>
> That is not to say that the extent of a prosecutor's "misconduct" is irrelevant to our analysis. The

---

4. Defendant has labeled this instance of misconduct as the prosecutor improperly commenting on his silence—the issue we address in section I.A. below.

propriety of a lower court decision may turn, in part, on the egregiousness of an attorney's misstep. If a prosecutor asks a question aimed at eliciting material that is both highly prejudicial and clearly inadmissible, that may suggest that the trial judge was plainly wrong in not intervening to block its admission *sua sponte*. The more plain or obvious the prosecutor's misstep, the greater the likelihood (other things being equal) that an appellate court would find plain error in a judge's failure to step in to stop it. That kind of thinking may be behind our assertion that "prosecutorial misconduct" can constitute plain error.

*State v. Hummel*, 2017 UT 19, ¶¶ 107–08, 393 P.3d 314. With this in mind, we now consider Defendant's claims of prosecutorial misconduct by "review[ing] the district court's actions under established exceptions to the law of preservation (here, plain error)." *Id.* ¶ 111. As explained above, this requires looking at whether "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Bond*, 2015 UT 88, ¶ 15, 361 P.3d 104 (brackets, citation, and internal quotation marks omitted).

A.    Comments on Defendant's Silence

¶18    Part of the prosecutor's cross-examination of Defendant included questions about the conversation that took place with Detective at the hospital. The prosecutor clarified that Defendant never gave Detective his explanation of events, ultimately asking, "Why didn't you tell this story to anybody when you got arrested?" Then, during closing argument, the prosecutor explained to the jury that "everything that the defendant told you today, he had the chance to say before."

¶19    The United States Supreme Court has held "that the use for impeachment purposes of [a defendant's] silence, at the time

of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). The State contends that *Doyle* is inapplicable because Defendant chose to talk after initially indicating a desire to exercise his right to remain silent. For purposes of our analysis, we need not decide whether Defendant exercised his right to remain silent. Even if we assume Defendant invoked his right to remain silent and that the prosecutor's question was out of bounds, Defendant has not demonstrated that the presumed error should have been obvious to the trial court or that the presumed error was harmful. *See Bond*, 2015 UT 88, ¶ 15.

¶20   As an initial matter, we note that any error related to the prosecutor's comment on Defendant's silence during closing argument was invited, and invited error precludes appellate review of an issue. Where trial counsel affirmatively waives an objection, we will not conduct a plain-error review of the underlying issue. *See State v. Maese*, 2010 UT App 106, ¶ 12, 236 P.3d 155. When defense counsel objected during closing argument, he did so on the basis of improper burden shifting. And when the trial court explicitly asked whether the issue was actually one related to Defendant's right to remain silent, defense counsel reiterated that his objection was to burden shifting. Under these circumstances, any error was invited and we will not consider this issue further.

¶21   We therefore focus our review on the prosecutor's questions during cross-examination of Defendant, and Defendant has not persuaded us that plain error requires reversal on this point.

¶22   To begin, any error would not have been obvious to the trial court. The prosecutor began the relevant line of questioning by asking Defendant whether he was aware that Detective had visited him in the hospital. Defendant answered, "Yes." The prosecutor then asked, "And you talked to him at the hospital, right?" Defendant again answered, "Yes." The prosecutor followed up by asking, "You didn't say anything to him about

this misunderstanding of you trying to surrender to [Officer] when [Detective] talked to you at the hospital, did you?" To this, Defendant responded, "No." The challenged question—whether Defendant shared his version of events with Detective—came immediately after Defendant said that he "talked to" Detective. In context, it would not have been clear to the trial court that the question related to Defendant's *silence*. Instead, the prosecutor's questions appeared to be an attempt to impeach Defendant's credibility.

¶23    "If a defendant takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination." *State v. Winward*, 941 P.2d 627, 634 (Utah Ct. App. 1997) (brackets, citation, and internal quotation marks omitted).

> In the instant case, appellant had no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts. During the challenged cross-examination, the prosecutor did not mention appellant's exercise of his right to silence . . . . The prosecutor never stated or implied that appellant's exercise of his right . . . was suggestive of guilt.

*See id.* (citations and internal quotation marks omitted).[5] Because it likely appeared to the trial court as if the prosecutor was

---

5. The similar situation presented in *Winward* led this court to conclude that the challenged questioning "was simply not error, and the first requirement of the plain error doctrine was not satisfied." *State v. Winward*, 941 P.2d 627, 634 (Utah Ct. App. 1997). The facts of the present case do not lend themselves to such a determination, as the record is less clear about if, when, or how long Defendant chose to exercise his right to remain silent. But *Winward* is nevertheless helpful to our analysis regarding the

(continued…)

properly using cross-examination to challenge the facts Defendant presented, we cannot conclude that any error in that questioning would have been obvious.

¶24 Furthermore, even if the trial court should have intervened in the cross-examination, its failure to do so did not harm Defendant. In deciding whether a prosecutor's comments on a defendant's silence were harmful, we typically consider

> (1) whether the jury would "naturally and necessarily construe" the comment as referring to defendant's silence; (2) whether there was overwhelming evidence of defendant's guilt; (3) whether the reference was isolated; and (4) whether the trial court instructed the jury not to draw any adverse presumption from defendant's decision not to testify.

*State v. Reyes*, 861 P.2d 1055, 1057 (Utah Ct. App. 1993) (quoting *State v. Tillman*, 750 P.2d 546, 554 (Utah 1987) (plurality opinion)).[6]

---

(…continued)
obviousness of any presumed error. Specifically, because it is unclear whether Defendant invoked his right to remain silent, to the trial court in the present case the situation would have appeared as it did in *Winward*; it would seem as if a prosecutor were rightfully challenging a testifying defendant regarding his version of events.

6. Again, because this claim is unpreserved, it does not fit within a standard prosecutorial-misconduct analysis and we instead use the framework applicable to a plain-error analysis. But as our supreme court clarified in *State v. Hummel*, 2017 UT 19, 393 P.3d 314, that does not render the prosecutor's conduct irrelevant. *Id.* ¶ 108. We consider the conduct of the prosecutor

(continued…)

¶25   We are confident that the jury would not necessarily construe the prosecutor's questions as referring to Defendant's silence, and there was strong evidence of Defendant's guilt. *See id.* at 1057. We acknowledge that the challenged comments appeared both during cross-examination and during closing argument; therefore, we cannot say that the comments were isolated. *See id.* No curative instruction was requested or given in the present case, *see id.*, but the lack of a curative instruction is unsurprising because Defendant testified. And even if a curative instruction were appropriate, we have already determined this issue was not preserved. Furthermore, any presumed error in the prosecutor's questions would not have been obvious to the trial court, thus, the trial court would not have sua sponte given such an instruction.

¶26   Whether a prosecutor's comment was likely construed as referring to silence is frequently considered in the context of a defendant's decision not to testify at trial. *See Tillman*, 750 P.2d at 554 (plurality opinion) ("Indirect references to a defendant's failure to testify are constitutionally impermissible if the comments were manifestly intended to be or were of such a character that the jury would naturally and necessarily construe them to be a comment on the defendant's failure to testify."); *State v. Hales*, 652 P.2d 1290, 1291–92 (Utah 1982) (considering whether a prosecutor's statement was "of such character that a jury would naturally and necessarily construe it to amount to a comment on the failure of the accused to testify" (citation and internal quotation marks omitted)). But it is also an important query when a prosecutor is accused of improperly discussing a defendant's post-arrest silence. In *State v. Maas*, 1999 UT App 325, 991 P.2d 1108, we discussed this situation at length and highlighted cases in our jurisprudence where this issue has been addressed. *Id.* ¶¶ 16–23. Ultimately, we concluded that because

---

(…continued)

as part of our analysis in determining the harmlessness of any improper comments.

"the prosecution did not attempt to cast the forbidden inference that [the defendant's] silence equaled guilt," the State committed no *Doyle* violation.[7] *Id.* ¶ 25; *see also Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (holding that using a defendant's post-*Miranda* silence to impeach him is unconstitutional).

¶27    Similarly, here, the prosecutor made no "attempt to cast the forbidden inference." *See Maas*, 1999 UT App 325, ¶ 25. Rather than asking Defendant, "Why didn't you say anything to the police?" the prosecutor essentially asked, "Why didn't you say *this* to the police when you did speak?" The line of questioning was meant to suggest fabrication, as Defendant admitted that he spoke with Detective at the hospital but did not share his version of events. Because the questions related more to Defendant's version of events than to any invocation of his right to silence, the jury would not have "naturally and necessarily construe[d] the comment as referring to defendant's silence." *See Reyes*, 861 P.2d at 1057 (citation and internal quotation marks omitted); *see also State v. McCallie*, 2016 UT App 4, ¶ 29, 369 P.3d 103 (explaining that where a defendant "in fact made statements to police, and the prosecutor's improper

---

7. Along with this quoted language, the *Maas* court also based its conclusion in part on the fact that the State did not use "defendant's silence to impeach her credibility." *State v. Maas*, 1999 UT App 325, ¶ 25, 991 P.2d 1108. At first blush, this reasoning seems to cut against our discussion above about the permissible impeachment of Defendant's credibility. *See supra* ¶¶ 22–23. However, the situation in *Maas* and the present case deal with two very different forms of silence. In *Maas*, the defendant invoked her right not to incriminate herself. But in the present case, in addressing whether any error would have been obvious to the trial court, we address something fundamentally different: Defendant saying one thing but not another. Specifically, the prosecutor elicited that when Defendant talked to Detective he was not completely silent but was silent as to his version of events, which Defendant then later shared at trial.

comments referred to these statements," we could not "say that a lay jury would naturally and necessarily have understood the prosecutor's reference as a comment on [the defendant's] silence in the Fifth Amendment sense"), *cert. granted*, 384 P.3d 567 (Utah 2016).

¶28    Furthermore, there was persuasive evidence of Defendant's guilt. Officer testified that Defendant proclaimed Officer was about to die, supporting the intent element of the aggravated murder charge. Four eyewitnesses testified that Defendant raised a knife and advanced toward Officer. Defendant admitted to having a knife and to holding it out toward Officer, although he maintained that he did so in a movement meant to signal surrender rather than attack. Whether Defendant did or did not share his version of events with Detective, invoked his right to remain silent, or actually remained silent is all of little consequence to the result given the evidence that was before the jury.

¶29    We therefore conclude that even if the trial court erred by failing to intervene when the prosecutor asked the now-challenged questions, that error would not have been obvious to the trial court, *see supra* ¶ 22, and the error did not harm Defendant. We thus reject Defendant's challenge to the prosecutor's alleged comments on Defendant's silence.

B.    Questions About Witness Discrepancies

¶30    During Defendant's cross-examination, the prosecutor asked why other witnesses' accounts of the evening differed from Defendant's: "So if you were trying to submit or surrender to the officer and these witnesses are perceiving something else, is it your testimony today that this is just a misunderstanding on their part?" Defendant now argues that this was "the prosecutor improperly examin[ing him] as to the veracity of other witnesses' testimony."

¶31    "Several courts have noted that it is improper to ask a criminal defendant to comment on the veracity of another

witness." *State v. Emmett*, 839 P.2d 781, 787 (Utah 1992). "However, a prosecutor may ask questions that seek 'to clarify defendant's testimony in relation to prior testimony of another witness.'" *State v. Thompson*, 2014 UT App 14, ¶ 48, 318 P.3d 1221 (quoting *State v. Taylor*, 884 P.2d 1293, 1299 (Utah Ct. App. 1994)).

¶32   In *Thompson*, we decided that "[t]he prosecutor's questions were appropriate" when, "[i]n cross-examining Thompson, the prosecutor reviewed Thompson's and Friend's testimonies" before "suggesting a discrepancy in the testimony." *Id.* ¶¶ 49–50. The prosecutor went on to state,

> "So, one of those wasn't true. Which one was the truth? It was either you got up at 9:00, or you got up at 7:15. Or maybe it was something else. Why don't you tell us what happened." The prosecutor later returned to the issue and asked, "You think [Friend is] wrong about that?"

*Id.* ¶ 49. We concluded that because "the prosecutor was not suggesting perjury or asking Thompson to comment on Friend's character or motivations" but instead "was highlighting a perceived discrepancy in the testimony and asking Thompson to clarify his testimony in relation to Friend's testimony," the questions were not improper. *Id.* ¶ 50.

¶33   We are confronted with similar facts here. The prosecutor did not say that Defendant was lying or ask Defendant to decide whether the other witnesses had lied. Instead, the prosecutor, like the prosecutor in *Thompson*, highlighted perceived discrepancies between Defendant's and the other witnesses' testimonies and asked Defendant to clarify. *See id.*

¶34   Because the prosecutor's questions were proper, there was no error, let alone one that could have been obvious to the trial court. *See State v. Bond*, 2015 UT 88, ¶ 15, 361 P.3d 104 (explaining that for an appellate court to conclude plain error

occurred, there must have been an error). Accordingly, Defendant's claim of plain error fails.

C.      Questions About Officer's Mindset

¶35     The third and final source of claimed prosecutorial misconduct originated in the State's examination of Officer. The prosecutor asked Officer what was going through his mind during his encounter with Defendant. *See supra* ¶ 10. Defendant argues that this line of questioning and the associated answers "unfairly appealed to the jury's sympathies, passions, and prejudice" by focusing the jury's attention on Officer's "fear of dying and his family, how they depended on him, and his need to get home to them."[8] The State counters that the question was proper because it helped establish the "credibility and plausibility" of Officer's testimony. We conclude that the question was improper but harmless.

¶36     We can see no permissible use of Officer's testimony regarding thoughts of his family when he encountered Defendant. Whether he had a family and whether that family relied on him is of little consequence when the jury was tasked with deciding whether Defendant attempted to murder Officer.[9]

---

8. Defendant's argument presents as a hybrid between a prosecutorial-misconduct claim and a challenge under rule 403 of the Utah Rules of Evidence. What Defendant seems to argue is that the prosecutor committed misconduct by deliberately introducing evidence that would be inadmissible under rule 403. But no rule 403 objection was lodged at trial, and thus the same plain-error standard applies whether we consider this claim one of prosecutorial misconduct or one of evidentiary error.

9. Whether Officer actually feared that Defendant was trying to kill him is a different question. Officer ultimately shot Defendant, and evidence of Officer's state of mind could be relevant to show that his use of force was not simply arbitrary,

(continued…)

And we have repeatedly held that a prosecutor may not call jurors' attention to matters that the jury would not be justified in considering when determining its verdict. *See, e.g., State v. Campos*, 2013 UT App 213, ¶ 50, 309 P.3d 1160. A jury may not find a defendant "guilty out of vengeance or sympathy for the victim rather than based on what the facts and the law required." *Id.* ¶ 52.

¶37 But while the jury should not have heard discussion of Officer's fear and concern for his family, we are not convinced that doing so influenced the verdict. The trial court instructed the jury that it should not allow "bias, sympathy, or prejudice" to affect the verdict. In the State's closing argument, the prosecutor reiterated the instruction, urging the jury to base its verdict on the facts, "however bad you may feel for Officer." Generally, absent evidence to the contrary, we "presume that the jury follows such instructions." *State v. Wright*, 2013 UT App 142, ¶ 42, 304 P.3d 887.

¶38 Furthermore, as we have already discussed, the evidence of Defendant's guilt was strong. *See supra* ¶ 28. Under the circumstances, we will not reverse for plain error because the error was harmless. *See State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993) (outlining the elements of a successful plain-error challenge, including that "the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant" and concluding that "[i]f any one of these requirements is not met, plain error is not established").

---

(…continued)
both as background information and to support Officer's credibility where there was conflicting testimony about the threat posed by Defendant. The relevance of such evidence is addressed more specifically *infra* ¶¶ 44–46. But the information actually elicited here went beyond that narrow issue into forbidden territory.

## II. Twenty-One-Foot Rule

¶39    The final issue on appeal relates to Officer's testimony regarding the twenty-one-foot rule. Defendant argues that this testimony "is inadmissible expert testimony. It is also irrelevant."

¶40    The challenged testimony came as the result of a question regarding the distance between Defendant and Officer when Defendant produced the knife. Officer told the prosecutor the distance was "from me to you," when Officer was "sitting at the witness stand and [the prosecutor was] standing at the witness podium." The prosecutor asked, "Is there anything about the distance between you and the defendant that caused you concern at this point?" Officer began to answer by saying, "There is. So I went through a federal training program. They teach you a rule with edged weapons," but before Officer could finish, defense counsel objected. During a sidebar discussion, Defense counsel argued that "his state of mind is not relevant, you know, to this case."[10] He also initially argued that Officer was not qualified to testify as to "what studies have shown or what any other officer or other officers have been instructed or anyone in the state of Utah would have been instructed if they were a peace officer." But defense counsel made clear that if the testimony instead pertained to whether "he was instructed that within 21 feet there's a danger zone or something of that

---

10. Beyond this initial assertion that the challenged testimony was irrelevant, defense counsel continued to object on this basis throughout the sidebar conversation and after the State's proffer of what Officer's testimony would be. He said, "I still don't see how it's relevant," "I don't think it's relevant," "I object to . . . the whole answer as relevant, which is going to his state of mind rather than the defendant's," and, "I'm sorry to be repetitive but just to be sure, my objection on relevance is that his state of mind, whether he felt threatened, is not an element of the offense and it's not . . . relevant."

nature," his objection would be "to the whole relevancy of it." Outside the presence of the jury, Officer proffered that he intended to explain that "when I went through the academy, they taught me that anything less than 21, 21 feet or less is a, is a kill zone." After this proffer, defense counsel said, "That would take care of my other objections."[11]

¶41　By indicating that his "other objections" were resolved—in context, meaning objections other than to relevance—defense counsel abandoned any challenge on the basis of expert testimony. And when the jury returned, Officer testified that when he went through training, "they instructed [him] that anything within 21 feet is a kill zone. Before somebody could get a shot off, they could actually get stabbed within that distance." In other words, Officer provided precisely the sort of testimony to which Defendant objected on "the whole relevancy of it."

¶42　By tying his expert-testimony objection to certain hypothetical testimony, Defendant's objection on this basis was abandoned when the actual testimony was given and differed from the hypothetically objectionable testimony. *See State v. McNeil*, 2013 UT App 134, ¶ 23, 302 P.3d 844 ("A claim is not preserved for appeal if a party initially objects but later, while 'the wheel's still in spin,' abandons the objection and stipulates to the court's intended action." (citation omitted)), *aff'd*, 2016 UT 3, 365 P.3d 699. Thus, any argument that the court committed

---

11. Defense counsel later briefly addressed expert testimony by suggesting that articulating a rule that it "constitutes a threat if you are within 21 feet" would be "in the nature of expert testimony." The trial court clarified, "I'm saying he can't say all officers are trained in this regard. He can say that's what he was trained on in [training], right?" The prosecutor weighed in, and defense counsel's only response was that "whether he felt threatened[] is not an element of the offense and it's not . . . relevant."

error by allowing Officer to testify as an expert is unpreserved, *see id.*, and we do not address it further.

¶43 On the other hand, Defendant's relevance objection was clearly preserved. *See supra* ¶ 40 note 10. And we will therefore consider the merits of Defendant's argument on appeal that the allowed testimony was irrelevant.

¶44 Evidence is relevant where it "has any tendency to make a fact more or less probable than it would be without the evidence" and where "the fact is of consequence in determining the action." Utah R. Evid. 401. "[E]vidence that has even the slightest probative value is relevant under the rules of evidence." *State v. Reece*, 2015 UT 45, ¶ 64, 349 P.3d 712 (citation and internal quotation marks omitted). Officer's testimony about the twenty-one-foot rule had probative value because it lent credibility to his version of events. As the trial court said, it helped explain why Officer reacted to the situation in the way that he did—by shooting Defendant.

¶45 Several witnesses testified at trial. "Whether or not these witnesses were credible was a fact of consequence in considering whether [Defendant] was guilty[.]" *See State v. Calliham*, 2002 UT 87, ¶ 38, 57 P.3d 220. The jury was tasked with finding the truth between two different stories. In one, Defendant was threatening. He yelled that Officer was "about to fucking die," pulled out a large knife, and lunged at Officer. Officer responded by shooting Defendant. In the other, Defendant never made such a verbal threat and instead carefully showed Officer his knife in an attempt to surrender. It seems logical that a police officer who shot a civilian because he felt threatened would be considered more credible than a police officer who shot a civilian who was attempting to surrender. By explaining to the jury one of the reasons Officer felt threatened, he was able to bolster his credibility. For this reason, Officer's testimony regarding his training with the twenty-one-foot rule was relevant. *Cf. id.* (concluding that photographs were relevant because of their "connection with the testimony of witnesses whose credibility

was in question" and holding "that the trial court did not abuse its discretion in finding the photographs relevant").

¶46 Because we agree with the trial court that testimony regarding the twenty-one-foot rule was relevant to show why Officer shot Defendant, and because that explanation supported the credibility of Officer's version of events, we cannot say that the trial court abused its discretion by allowing the testimony.[12]

CONCLUSION

¶47 We are not persuaded that the prosecutor's conduct at trial constituted plain error that harmed Defendant. We are likewise unpersuaded that the trial court abused its discretion in allowing Officer to testify regarding the twenty-one-foot rule. For these reasons, we will not disturb the jury's verdict.

¶48 Affirmed.

———————

12. Lumped in with his discussion of the twenty-one-foot rule, Defendant asserts that "admission of this evidence and the harm caused by the prosecutor's misconduct constitutes cumulative error requiring the reversal of [Defendant's] conviction." Even if we believed Defendant's cumulative-error claim were properly and thoroughly briefed, a claim of cumulative error requires a demonstration that the cumulative effect of several errors undermines our confidence that Defendant had a fair trial. *See State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993). We have presumed two errors for purposes of our analysis, *see id.*, but those presumed errors do not combine to undermine our confidence in Defendant's conviction given the strength of the State's evidence. Several witnesses testified that Defendant lunged at Officer with a large knife, and this testimony supports Defendant's conviction, even when all presumed errors are taken into account.