**2019 UT App 64**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANTHONY CHARLES MURPHY,
Appellant.

Opinion
No. 20170193-CA
Filed April 25, 2019

First District Court, Logan Department
The Honorable Thomas Willmore
No. 091100683

Michael C. McGinnis, Attorney for Appellant

Sean D. Reyes and Lindsey L. Wheeler, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGE JILL M. POHLMAN concurred. JUDGE RYAN M. HARRIS
concurred, with opinion.

ORME, Judge:

¶1 Defendant Anthony Charles Murphy appeals his convictions for aggravated sexual assault, aggravated kidnapping, forcible sexual abuse, and aggravated assault of his then-wife (Victim). He argues that the trial court abused its discretion by admitting evidence of other allegations of sexual assault made against him pursuant to rule 404(b) of the Utah Rules of Evidence and by denying his motions for a mistrial. He also alleges that he received ineffective assistance when his trial

counsel did not call expert witnesses to corroborate his version of events.[1] We affirm.

BACKGROUND[2]

¶2 Defendant and Victim married in August 2008. Soon after, Defendant began to verbally, physically, and sexually abuse Victim, culminating in the events of May 31, 2009, for which he was charged with, and convicted of, various crimes.

¶3 The day in question began "as a fun, relaxing, playful day." The couple spent most of the day in their backyard cultivating their garden and target shooting with BB guns. Defendant began drinking around 10 a.m., and Victim had her first drink around noon. All was well until approximately 7:30 p.m. By then, both Victim and Defendant had consumed copious amounts of alcohol. Defendant received a text message from a woman whom Victim had previously caught flirting with him. Defendant's receipt of the text message infuriated Victim, and she began yelling at him. He responded by laughing at her. Exasperated, Victim left Defendant in the backyard and went to bed.

¶4 Defendant later entered the bedroom and asked Victim if they could "work this out." Victim returned with Defendant to the backyard, and the two started dancing. After dancing for a short while, Defendant began spinning Victim quickly around

---

1. Defendant raises other arguments, but we do not reach them because they were not preserved for appeal. *See infra* ¶¶ 14, 16, 18.

2. "On appeal, we construe the record facts in a light most favorable to the jury's verdict" and recite the relevant facts accordingly. *State v. Maestas*, 2012 UT 46, ¶ 3, 299 P.3d 892 (quotation simplified).

until she fell to the ground. Victim asked him to stop because he was hurting her. Defendant ignored her pleas, pulled her up from the ground, and tore off her shirt, bra, shorts, and underpants. Victim screamed for help, and Defendant told her to "shut up" and that "[n]obody was coming to save [her]."

¶5     Naked, Victim fled into the house. She ran upstairs to the second floor seeking to dress, retrieve her car keys, and leave the house. Defendant caught up with her when she reached the second floor and pushed her down the staircase. He then dragged her into the family room, repeatedly telling her, "you'll remember me." In the family room, Defendant straddled Victim on the floor with both knees on her chest, constraining her breathing. In this position, he hit her multiple times in the face with his erect penis and repeated, "[S]uck it. Suck it, bitch." Victim initially resisted but eventually gave in. "Off and on" for the next twenty minutes, Defendant forced Victim to perform oral sex on him.

¶6     Victim attempted to crawl away, but when she reached the hallway, Defendant lifted her up by the throat, pressed her against the wall, and strangled her. He told her, "I'm going to kill you, bitch," and Victim passed out shortly thereafter. When she regained consciousness, she found herself soaked in her own urine. Defendant then dragged her into the upstairs bathroom, threw her into the bathtub, turned on the cold water, and ordered her to "get cleaned up."

¶7     Victim's next memory was that of Defendant pushing her down the stairs for a second time after she attempted to escape through the back door. He then dragged her into the back bedroom, used his knees to pin her down by her shoulders, and again forced his penis into her mouth. Victim choked on his penis and lost consciousness for a second time.

¶8     Sometime after midnight, Victim was finally able to escape when Defendant passed out due to his excessive alcohol consumption. Victim put on a robe, grabbed her car keys, and

drove to her friends' house. They gave her a mild sedative, and Victim spent the night at their house. She woke the next day feeling like a "punching bag," "[e]verything hurt." Bruises had started forming on her face and on her chest, where Defendant had knelt on her while pinning her down. Her throat was extremely sore. She described that "it felt like the worst case of strep throat [she] had ever had."

¶9     Fearing the loss of her job, Victim insisted on going to work that day despite her injuries. One of her friends accompanied her back to her house so that she could get ready. At the house, they found Defendant passed out on a couch. Victim quickly showered, dressed, and applied heavy makeup to cover the bruises on her face. Despite these efforts, her coworkers immediately noticed that her face was red, swollen, and covered in bruises. One coworker described Victim's face as "grotesquely swollen." Victim, who usually had a gregarious personality, was also "unnaturally subdued," "not talkative," and attempted to hide her face from her coworkers. After much coaxing, Victim admitted to a coworker that she had been physically assaulted. Against Victim's wishes, her coworkers then contacted the authorities.

¶10    The officer who responded to the call testified that Victim's face "was very battered" and that she was "probably one of the worst victims [he] had seen." Her eye sockets and cheeks were swollen, her lip was cut, and there was redness around her neck, which appeared to be consistent with strangulation. The officer interviewed Victim and photographed her injuries. The next day, Victim visited a doctor. The doctor noted that her rib cage was "very tender" and that pain prevented her from being able to fully open her jaw. He also noted bruising on her upper chest, right leg, and lip.

¶11    A few days later, two police officers accompanied Victim on a walkthrough of her house to collect evidence. The police observed a handprint on the wall against which Defendant had strangled Victim. Directly underneath the handprint, where

Victim had urinated, the officers noted that the carpet was discolored from an attempted cleaning. And in the laundry room, they found bedding with blood stains and torn clothing that matched Victim's description of what she had worn on the day of the assault.

¶12 The State charged Defendant with aggravated sexual assault and aggravated kidnapping, first-degree felonies; forcible sexual abuse, a second-degree felony; and aggravated assault, a third-degree felony. He was tried in 2016.[3] A jury found him guilty of all charges. He was sentenced to two consecutive fifteen-years-to-life sentences for his aggravated sexual assault and aggravated kidnapping convictions, and concurrent sentences of one-to-fifteen years and zero-to-five years for his forcible sexual abuse and aggravated assault convictions, respectively.

ISSUES AND STANDARDS OF REVIEW

¶13 Defendant raises six claims on appeal, three of which we do not address on the merits. First, he argues that the trial court erred in its application of rules 404(b) and 403 of the Utah Rules of Evidence when it admitted evidence of additional allegations of sexual assault made against him by other women. Due to a trial court's advantaged position over that of appellate courts "to assess the avowed basis for evidence of prior misconduct—and to judge its likely effect in prejudicing or confusing the jury"— we review a trial court's decision to admit evidence under rules 404(b) and 403 for abuse of discretion. *See State v. Thornton*, 2017 UT 9, ¶ 56, 391 P.3d 1016.

¶14 Second, Defendant contends that the State committed prosecutorial misconduct when it made inappropriate comments

---

3. Although the State charged Defendant in 2009, various pretrial matters significantly delayed the trial.

during the rebuttal portion of its closing arguments. Generally, "insofar as this issue was preserved, we will review the trial court's rulings on prosecutorial misconduct claims for an abuse of discretion." *State v. Fairbourn*, 2017 UT App 158, ¶ 13, 405 P.3d 789 (quotation simplified). Otherwise, we typically review unpreserved issues only when a valid exception to the preservation rule applies. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. Here, Defendant's counsel did not object to the allegedly inappropriate comments made by the State on the ground that they amounted to prosecutorial misconduct.[4] And because Defendant has not argued that an exception to the preservation rule applies, we have no occasion to address the merits of this issue on appeal. *See Oseguera v. State*, 2014 UT 31, ¶ 15, 332 P.3d 963 ("When a party seeks review of an unpreserved objection, we require that the party articulate an appropriate justification for appellate review in the party's opening brief.") (quotation simplified).

¶15 Third, Defendant asserts that the trial court erred in denying his motions for a mistrial. We review a trial court's ruling on a motion for a mistrial for abuse of discretion and reverse only if the court's decision "is plainly wrong in that the incident so likely influenced the jury that the defendant cannot

---

4. Defendant argues that this issue was preserved by an objection his trial counsel made to the comments during the State's rebuttal. But his counsel did not object to the comments on the ground that they amounted to prosecutorial misconduct, as he now asserts on appeal. Rather, his counsel objected to the remarks on the ground that they exceeded the scope of the defense's closing argument. The limited nature of the objection did not present the trial court with an opportunity to rule on the State's alleged misconduct, thereby rendering the issue unpreserved for appeal. *See Oseguera v. State*, 2014 UT 31, ¶ 10, 332 P.3d 963 ("[A] party that makes an objection based on one ground does not preserve any alternative grounds for objection for appeal.").

be said to have had a fair trial." *State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730 (quotation simplified).

¶16    Fourth, Defendant claims that his aggravated kidnapping and aggravated sexual assault convictions should merge under the common-law merger test of *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, *overruled by State v. Wilder*, 2018 UT 17, 420 P.3d 1064.[5] Defendant recognizes that this claim was not fully preserved below[6] and urges us to "review this issue under [the] plain error and ineffective assistance of counsel" exceptions to the preservation rule. But he focuses his argument on the merits of the claim and does not address this unpreserved issue through the lens of either of these exceptions. Accordingly, we decline to reach the merits of this claim. *See True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 30, 427 P.3d 338 ("If a party fails to argue and

_____

5. Although we do not address this claim on the merits, we take this opportunity to recognize that the common-law merger test first articulated in *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, and which forms the basis of Defendant's claim on appeal, was abrogated after the parties submitted their opening briefs. In *State v. Wilder*, 2018 UT 17, 420 P.3d 1064, our Supreme Court renounced the common-law merger test and held "that the controlling test is the statutory standard set forth in Utah Code section 76-1-402(1)." *Id.* ¶ 38.

6. Following trial, Defendant moved the trial court to merge his (1) aggravated kidnapping conviction into his aggravated assault conviction and (2) his aggravated sexual assault conviction into his forcible sexual abuse conviction, both which the trial court denied. But Defendant does not appeal the trial court's denial of this motion. Instead, he argues for the first time on appeal that his aggravated kidnapping conviction should merge into his aggravated sexual abuse conviction. Because Defendant did not raise this particular merger claim before the trial court, this issue is unpreserved. *See Oseguera v. State*, 2014 UT 31, ¶ 10, 332 P.3d 963.

establish the applicability of a preservation exception, the appellate court will not reach the unpreserved issue."). *See also State v. Ring*, 2018 UT 19, ¶ 35, 424 P.3d 845 (stating that in order to prevail on a claim of ineffective assistance of counsel, a defendant must show (i) "that his trial counsel's performance was deficient" and (ii) "that the deficient performance prejudiced the defense") (quotation simplified); *Johnson*, 2017 UT 76, ¶ 20 (stating that "plain error is not established" unless the defendant shows that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful") (quotation simplified).

¶17 Fifth, Defendant claims to have received constitutionally ineffective assistance from his trial counsel. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law which we consider de novo." *State v. Courtney*, 2017 UT App 172, ¶ 20, 424 P.3d 198 (quotation simplified).

¶18 Lastly, Defendant argues that the evidence presented at trial was insufficient to support the jury's verdict. However, as with his second and fourth claims, this issue is not preserved and we do not reach it.[7]

---

7. An insufficiency-of-the-evidence argument is preserved for appeal when raised in an appropriate motion. Defendant claims that this issue was preserved by his motion to arrest judgment, which his trial counsel filed following the jury's verdict. *See State v. Holgate*, 2000 UT 74, ¶ 16, 10 P.3d 346. *See also* Utah R. Crim. P. 23. But that motion asked the trial court to arrest judgment based on (1) the admission of the rule 404(b) evidence, Defendant's first claim on appeal, and (2) the presentation of evidence to the jury that had previously been ruled inadmissible by the trial court, Defendant's third claim on appeal. The motion did not argue that insufficient evidence supported the jury's guilty verdict. And because Defendant has not argued an exception to

(continued…)

ANALYSIS

I. 404(b) Evidence

¶19    In 2010, the State initially sought to admit 404(b) evidence that Defendant had similarly assaulted his then estranged—now ex—wife (GM). The State sought to have the evidence admitted for the non-character purpose of showing Defendant's intent and the absence of mistake. The trial court denied this motion. Defendant contends that the trial court erroneously granted the State's subsequent motion to admit evidence under rule 404(b) of the Utah Rules of Evidence. Specifically, he argues that it failed to sufficiently analyze the evidence under rule 403 before granting the motion.

¶20    The State filed its second motion to admit evidence under rule 404(b) in 2014. This time, in addition to the assault involving GM, the State sought to admit evidence of three other allegations of sexual assault made against Defendant by other women. The motion sought to have evidence concerning all four incidents admitted under the doctrine of chances to refute Defendant's claim that he acted in self-defense and that Victim had fabricated her account.[8]

---

(…continued)
the preservation rule, we do not reach the merits of this claim. *See supra* ¶ 14.

8. Defendant claimed that Victim was the aggressor. He testified at trial that Victim went into "a jealous rage" after he received a text message from the woman she disliked. According to him, Victim grabbed a paring knife and, although not necessarily trying to stab him, she hit him multiple times with it and cut him on the chest. In response, he pushed her back by hitting her in the chin with the palm of his hand. Fearing that she would lunge at him, he then pushed her further back by kicking her in the

(continued…)

¶21    Concluding that the State sought to introduce the evidence for a proper non-character purpose, that the evidence was relevant, and that it would not unfairly prejudice Defendant, the trial court granted the State's motion to introduce evidence of the four instances of alleged misconduct. The allegations of sexual assault were made by four women in three different states over the span of sixteen years. In addition to GM, these witnesses were MM, AK, and AM.

¶22    MM accused Defendant of assaulting her while he was out on bond for attacking Victim. In 2013, MM met Defendant at a hotel in West Valley City, Utah, to give him a sensual massage that concluded with a "hand job." Defendant had consumed alcohol that night, and while MM performed the latter portion of their arrangement, Defendant began pulling on her underwear. MM repeatedly told him "no" and pushed his hand away until Defendant, having become enraged, wrestled her to the floor. Defendant reacted to MM's screams by placing his hands around her neck with his thumbs in her mouth and strangling her. MM did not lose consciousness, but her vision "went black," she saw "stars," and she became "dizzy." Defendant eventually let go of MM's throat and climbed off her, but he did not allow MM to get her phone. She was able to escape when the hotel's front desk attendant, responding to a noise complaint, interceded. Defendant was subsequently arrested and charged. Prior to trial in the instant case, but after the hearing on the State's second 404(b) motion, Defendant was convicted of assault and patronizing a prostitute in the case involving MM.

¶23    AK accused Defendant of sexually assaulting her in Kentucky in 2003. She and Defendant were friends and, on the

---

(…continued)

chest and shoulder area. She then dropped the knife, grabbed her car keys, and left their house. He testified he acted in self-defense and that Victim fabricated her account of physical and sexual abuse.

night in question, the two went for a drive. AK drank whiskey and passed out during the drive. She did not remember whether Defendant also consumed alcohol. When she woke up, she found that her pants and underwear had been removed. Defendant then began insisting that she had promised "to suck his penis" and demanded that she make good on that promise. When AK refused, he hit her in the face with a folder and shoved her head down toward his penis, forcing it into her mouth. AK cried and begged him to let her go home. Defendant repeatedly hit her and, knowing she had a phobia of water, threatened to drown her in a nearby creek if she did not stop crying. He forced her to sign a document stating that she consented to sex with him. He then laid her down in the front seat of the vehicle and vaginally raped her after unsuccessfully attempting to penetrate her anus. Following the rape, he drove AK to her mother's house. Defendant was not charged in connection with this incident.

¶24 AM accused Defendant of sexually assaulting her in Kentucky in 2001, when she was fifteen years old. She was the daughter of one of Defendant's friends. On the day of the assault, her father and Defendant returned from a bar "pretty intoxicated" and continued drinking in her house. Defendant attempted to dance with AM but, feeling uncomfortable, she refused. She later went to bed and was awakened by Defendant climbing on top of her. He inhibited her breathing by pressing his hand down hard against her face, fondled her breasts under her shirt, kissed her neck, and touched her genitals. AM eventually succeeded in freeing her mouth by biting Defendant's hand, and she screamed to her father for help. Her father ran into the room and pulled Defendant off her. She ran into another bedroom, but Defendant pursued, tackled, and touched her again. AM's father once more managed to pull him away from her. AM then ran to a neighbor's house. Defendant again pursued AM, attempted to break into the neighbor's house, and assaulted the neighbor's husband. Defendant was charged with sexual abuse of AM and with assault of the neighbor's husband.

A jury convicted Defendant on the assault charge, but it could not reach a verdict on the sexual abuse charge.

¶25 GM accused Defendant of assaulting her in Florida in 1997.[9] She and Defendant were married but separated at the time of the alleged assault. One early morning in June, Defendant broke into her house. He smelled of alcohol and wanted to talk. When she refused, he grabbed her by the arm, said "okay, no more talk," and dragged her into an unoccupied bedroom. During the hours-long sexual assault that ensued, Defendant twice vaginally raped GM, attempted anal penetration, and sat on her chest and forced his penis into her mouth. Defendant was arrested and charged with aggravated kidnapping and sexual assault. Two months later, while out on bond, Defendant again broke into GM's house. This time, GM pulled a gun from underneath her pillow and shot him five times. The State of Florida entered into a plea deal with Defendant in which Defendant pled guilty to one count of second-degree burglary in exchange for the dismissal of the aggravated kidnapping and sexual assault charges. This generous deal—or so the Utah prosecutor suggested in the case before us—was the product of the five bullet holes that Defendant sustained in the course of the second intrusion into GM's home.

¶26 In conjunction with the testimonies of MM, AK, and AM, the State called a statistician as an expert witness. The statistician testified that there is a 0.0004% chance of a person being arrested for rape or attempted rape in Utah. The probability of being twice accused of or arrested for rape or attempted rape was one in four million; thrice was one in eight billion; four times was one in sixteen trillion; and five times was one in thirty-two quadrillion. The odds of being falsely accused of rape or attempted rape on five separate occasions were further

---

9. GM's testimony was ultimately excluded at trial as part of the court's ruling on Defendant's motion for a mistrial. *See infra* ¶¶ 34–35.

increased, according to the expert, when similar claims of alcohol consumption or strangulation were factored into the analysis.

¶27 Rule 404(b) of the Utah Rules of Evidence generally permits evidence of a defendant's other crimes, wrongs, or bad acts so long as the evidence has a "probative value other than to show an evil propensity or criminal temperament." *State v. Fedorowicz*, 2002 UT 67, ¶ 27, 52 P.3d 1194 (quotation simplified). The doctrine of chances is applied in the context of rule 404(b). *State v. Lowther*, 2017 UT 34, ¶ 31, 398 P.3d 1032. It is "a theory of logical relevance, which a proponent may use to argue that, using probability reasoning, a factfinder may infer that a disputed fact is more likely or less likely to be true due to the recurrence of some improbable event." *State v. Labrum*, 2014 UT App 5, ¶ 26 n.9, 318 P.3d 1151 (quotation simplified). In other words, "the claim is based on the disparity between the expected and actual values: How many incidents would we expect the average person to be involved in, and how many incidents was the defendant involved in?" Edward J. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, The Doctrine of Chances*, 40 U. Rich. L. Rev. 419, 448 (2006). *See State v. Lopez*, 2018 UT 5, ¶ 50, 417 P.3d 116. Thus far, Utah appellate courts have upheld the application of the doctrine of chances for the purposes of showing intent; establishing lack of mistake, coincidence, or accident; rebutting a charge of fabrication; and in cases involving rape, showing the defendant's requisite mens rea or the victim's lack of consent.[10] *Id.* ¶ 49. *See State v. Lomu*, 2014 UT App 41, ¶ 25, 321 P.3d 243.

---

10. It is currently unclear whether the doctrine of chances may be applied to show identity. *See State v. Lopez*, 2018 UT 5, ¶ 49, 417 P.3d 116 ("[W]e have not previously applied the doctrine of chances to show identity . . . [and] need not resolve whether such application would be proper because the doctrine is inapplicable

(continued…)

¶28    As with other 404(b) evidence, courts must undertake a three-step analysis before admitting evidence under the doctrine of chances. *See State v. Killpack*, 2008 UT 49, ¶ 45, 191 P.3d 17 ("Such evidence is admissible if it (1) is relevant to, (2) a proper, non-character purpose, and (3) does not pose a danger for unfair prejudice that substantially outweighs its probative value.") (quotation simplified). The first and second steps, governed by Utah Rules of Evidence 402 and 404(b), respectively, require trial courts to ensure that the evidence is being offered for, and is relevant to, a proper non-character purpose. *See Lowther*, 2017 UT 34, ¶ 32. Under the doctrine of chances, this determination requires a four-part analysis of "(1) materiality, (2) similarity, (3) independence, and (4) frequency."[11] *Id.* Defendant does not

_____

(…continued)

to the set of facts presented here."). *See also State v. Lucero*, 2014 UT 15, ¶ 15 n.14, 328 P.3d 841 (rejecting, on procedural grounds, the argument that evidence was admissible under the doctrine of chances to show identity), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

11. Because Defendant does not challenge the trial court's four-part analysis on appeal, we do not address the foundational requirements further other than to clarify a point of confusion that was expressed during oral argument and is evident in Defendant's briefing. In his reply brief, Defendant argues that our Supreme Court in *State v. Lopez*, 2018 UT 5, 417 P.3d 116—an opinion the Court issued after the parties' opening briefing but before Defendant submitted his reply brief—"set[] a higher legal standard on similarity and before a prior act can be admitted under the doctrine of chances." Namely, he argues "the recent *Lopez* case states that the prior incidents must have been 'highly similar' to be introduced as evidence under the doctrine of chances," and the trial court therefore erred in admitting evidence of the other allegations of sexual assault brought against Defendant. However, *Lopez* did not heighten the legal

(continued…)

(…continued)

standard of "similarity," the second element of the four-part test, as Defendant claims. When our Supreme Court first announced the doctrine of chances in *State v. Verde*, 2012 UT 60, 296 P.3d 673, it stated that each incident "*must be roughly similar to the charged crime. . . .* [They all] must at least fall into the same general category." *Id.* ¶¶ 58–59 (emphasis in original) (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. It also explicitly distinguished the "similarity" requirement of the doctrine of chances from that used to prove identity through modus operandi: "The required similarity here need not be as great as that necessary to prove identity under a 'pattern' theory." *Id.* ¶ 58. *See Modus Operandi*, Black's Law Dictionary 1095 (9th ed. 2009) (defining modus operandi as "[a] method of operating or a manner of procedure; esp. a pattern of criminal behavior so distinctive that investigators attribute it to the work of the same person"). *See also State v. Lucero*, 2014 UT 15, ¶ 15, 328 P.3d 841 ("In seeking admission of prior acts for the purpose of proving 'identity,' parties are most often actually seeking to admit evidence of an intermediate inference, such as modus operandi, that bears on the ultimate issue of identity."), *abrogated on other grounds by Thornton*, 2017 UT 9. The inclusion of 404(b) evidence for the purpose of establishing identity through modus operandi—a separate basis from the doctrine of chances—sets a much higher standard of similarity. In *Lopez*, in the context of discussing modus operandi, our Supreme Court reiterated that higher standard: "To use a prior act to show modus operandi, the prior act must bear a very high degree of similarity to the charged act and demonstrate a unique or singular methodology." 2018 UT 5, ¶ 40 (quotation simplified). Although our Supreme Court did discuss the doctrine of chances later in *Lopez*, *see id.* ¶¶ 48–60, it had not yet broached the subject at the time it provided the heightened standard for evaluating the admissibility of evidence under the modus operandi exception of rule 404(b). Thus, the

(continued…)

challenge the trial court's analysis with respect to these factors, instead concentrating his attack on step three.

¶29   The third step requires the court to conduct a rule 403 balancing test, *see id.*, which generally focuses on whether the "probative value [of the evidence] is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Utah R. Evid. 403. Under the doctrine of chances, the focus of the rule 403 analysis is primarily "on the risk that the jury may draw an improper character inference from the evidence or that it may be confused about the purpose of the evidence." *State v. Lowther*, 2015 UT App 180, ¶ 22, 356 P.3d 173 (quotation simplified), *aff'd on other grounds*, 2017 UT 34, 398 P.3d 1032. Trial courts "are not bound to any particular set of factors or elements when conducting a rule 403 balancing test," and "may consider any relevant fact" in doing so, including some of the elements of the doctrine of chances'

---

(…continued)
standard for "similarity" under the doctrine of chances analysis remained unaltered in *Lopez*. The other incidents need only "*be roughly similar to the charged crime.*" *Verde*, 2012 UT 60, ¶ 58 (emphasis in original).

Because the "similarity" standard remains unchanged and because Defendant challenges the trial court's "similarity" analysis for the first time in his reply brief, we do not further address this argument other than to clarify that the standard of "similarity" applied by a court is dependent on the purpose for which the evidence is offered under rule 404(b)—to show identity through modus operandi; or to allow a jury to infer guilt based on the unusual frequency that rare events, such as accusations of sexual assault, befell a defendant. *See Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 ("It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court.") (quotation simplified).

four-part test—materiality, similarity, independence, and frequency. *State v. Lowther*, 2017 UT 34, ¶¶ 29, 41, 398 P.3d 1032.

¶30   On appeal, Defendant does not find fault with the trial court's determinations under the first and second analytic steps, but he argues that the trial court failed to conduct a proper analysis under rule 403 before admitting evidence of the aforementioned allegations made against him under the doctrine of chances. He contends that the other misconduct evidence confused the jury and unfairly prejudiced his defense.

¶31   Having concluded that the four other allegations of sexual misconduct made against Defendant satisfied the four foundational requirements of the doctrine of chances, the trial court used the reasoning behind the doctrine to conclude that the "information will be more helpful to a jury than harmful in eliciting truth." It reasoned, quoting *Verde*, that "when two (or more) persons tell similar stories, the chances are reduced that both are lying or that one is telling the truth and the other is coincidentally telling a similar false story." *State v. Verde*, 2012 UT 60, ¶ 48, 296 P.3d 673 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. We see no abuse of discretion in the trial court's analysis.[12] *See*

---

12. Defendant argues that the trial court had previously ruled the evidence to be unfairly prejudicial in its denial of the State's first 404(b) motion. But this alone is insufficient to conclude that the trial court abused its discretion in later concluding that the evidence was not unfairly prejudicial. Rule 403 of the Utah Rules of Evidence provides, with our emphasis, that a "court may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice." The State initially attempted to admit evidence of GM's allegations against Defendant for the purpose of showing Defendant's intent. In this context, the trial court found that the prejudicial effect of GM's testimony substantially outweighed its probative value in establishing Defendant's intent. When the State brought its

(continued…)

*Thornton*, 2017 UT 9, ¶ 56 ("[T]he question for us is not whether we would have admitted this evidence. It is whether the district judge abused his broad discretion in doing so.").

¶32 Defendant's contention that the jury was likely to be confused as to the purpose of the 404(b) evidence is likewise unavailing. The trial court twice instructed the jury as to the purpose of the 404(b) evidence and the limited nature in which the jurors were to consider such evidence. "We generally presume that a jury will follow the instructions given it," and Defendant has not provided evidence to suggest that the jury in the present case did otherwise. *State v. Beckering*, 2015 UT App 53, ¶ 24, 346 P.3d 672 (quotation simplified).

¶33 For these reasons, we conclude that the trial court did not abuse its discretion by concluding that the 404(b) evidence need not be excluded under rule 403.

## II. Mistrial Motions

¶34 Defendant next appeals the trial court's denial of his motions for a mistrial. He contends that unfairly prejudicial information was presented to the jury, the trial court's curative measures were ineffective, and the court therefore abused its discretion in denying his motions. Defendant's trial counsel first

---

(…continued)

second 404(b) motion, it sought to introduce evidence of three allegations in addition to that of GM for the purpose of rebutting Defendant's claim that Victim fabricated her account. When presented with the second motion, the trial court found that the new purpose—to rebut a charge of fabrication—and the increased number of roughly similar allegations of sexual misconduct made against Defendant greatly enhanced the probative value of the evidence. As such, in that context, the danger of unfair prejudice no longer substantially outweighed the probative value of the evidence.

moved for a mistrial after Victim testified that GM shot Defendant five times—evidence the trial court had previously ruled inadmissible unless Defendant first opened the door to it. The testimony in question was given on the second day of trial and was elicited in the following manner:

> [The State]: At the time that you reported this assault to the Smithfield Police Department were you aware of any general allegation that [GM] had made against this defendant?
>
> [Victim]: That they had filed for divorce.
>
> [The State]: Well, I'm talking about like a criminal accusation. Were you aware that she had accused him of any crimes?
>
> [Victim]: I understand she shot him five times.

¶35 Following this exchange, Defendant's counsel moved for a mistrial. The court ruled that although the State had not intentionally elicited Victim's improper response, the reference to GM having shot Defendant five times unfairly prejudiced his defense. Nevertheless, the trial court determined that the prejudice could be cured. As a remedial measure, the court precluded the State from presenting GM's testimony against Defendant, thereby reducing the number of prior assaults the jury would hear about from four to three. The court also struck from the record all questions and answers between the State and Victim regarding GM and instructed the jury to disregard the stricken exchange.

¶36 At the conclusion of that day of trial, one juror asked for the name of Defendant's ex-wife. After the court stated that it already provided the name in its curative instruction, the juror responded, "We can remember her name. We just can't remember anything else." The court responded, "No. You don't even need to remember her name. You don't even need to

consider anything about [GM]." Defendant's trial counsel subsequently renewed his motion for a mistrial asserting that, despite the court's curative instruction, the jury was still considering Victim's testimony regarding GM. The trial court denied the renewed motion, stating that the jury was "trying to understand and follow [the court's] instruction." "Really," according to the court, "the question was 'do we forget her name?,'" and the question "didn't go to anything else."

¶37 Appellate courts accord great deference to a trial court's ruling on a motion for a mistrial given "the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings." *State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (quotation simplified). Accordingly, absent a showing on the record that "the trial court's decision is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial," we will not conclude there was an abuse of discretion. *Id.* (quotation simplified). Defendant thus bears the burden of showing "that the challenged incident *substantially influenced* the verdict." *State v. Maama*, 2015 UT App 235, ¶ 19, 359 P.3d 1272 (emphasis in original) (quotation simplified). Furthermore, a trial court need not declare a mistrial "where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *State v. Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730.

¶38 To show that the improper statement influenced the jury's decision, Defendant points to the exchange between the juror and the trial court at the conclusion of the second day of trial.[13]

---

13. Defendant incorrectly applies the governing legal standard in his analysis, arguing that the exchange suggests that "there is a 'reasonable likelihood' that the improper statement influenced the jury." We take this opportunity to emphasize the distinction between the legal standard applied by a trial court on a motion for a mistrial and the legal standard applied by appellate courts

(continued…)

We recognize that the exchange suggests that the improper testimony may have been on the minds of the jurors during the second day of trial, but we nonetheless remain unconvinced that, without the testimony, "there is a substantial likelihood that the jury would have found [Defendant] not guilty," *Butterfield*, 2001 UT 59, ¶ 47, for the reasons that the statement was relatively innocuous, it was made in passing, and the evidence of Defendant's guilt was overwhelming, *see Allen*, 2005 UT 11, ¶ 40.

¶39 Although the fact that a defendant was shot might have stood out more prominently in other trials, in the current case the highly graphic and disturbing nature of the evidence presented to the jury over the course of six days—including the testimony of Victim, MM, AM, and AK—overshadowed the fact that GM shot Defendant, rendering the statement relatively innocuous.[14] Victim's improper testimony was also made in

---

(…continued)

in reviewing a trial court's ruling. When ruling on a motion for a mistrial, a trial court must determine whether the "incident *may have* or *probably* influenced the jury, to the prejudice of the defendant." *State v. Cardall*, 1999 UT 51, ¶ 18, 982 P.2d 79 (emphasis in original) (quotation simplified). But when the trial court's ruling is challenged on appeal, the scope of appellate review is more limited. *See State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133; *Cardall*, 1999 UT 51, ¶ 19. On appeal, a defendant must show "that the verdict was *substantially* influenced by the challenged testimony." *Butterfield*, 2001 UT 59, ¶ 47 (some emphasis omitted) (quotation simplified). Thus, although the argument that there was a "reasonable likelihood" that Victim's improper testimony influenced the jury would have been proper before the trial court, the argument is insufficient to satisfy the legal standard on appeal.

14. We further note that the trial court greatly reduced any potential prejudicial effect of the improper testimony by depriving the jury of the context in which GM shot Defendant.

(continued…)

passing, and it consisted of a single sentence in a trial transcript that exceeds 1,000 pages. Accordingly, the trial court did not abuse its discretion in denying Defendant's motions for mistrial.

## III. Ineffective Assistance of Counsel

¶40   Defendant argues that he received ineffective assistance when his trial counsel did not call expert witnesses to rebut the testimonies of the four expert witnesses called by the State.[15] In particular, Defendant points to his trial counsel's decision not to call an expert witness to corroborate Defendant's account that the cuts and bruises on his chest were obtained defensively rather than offensively and to rebut the State's expert who testified that the injuries to Defendant's chest could not have been sustained in the manner claimed by Defendant. Defendant also directs our attention to his trial counsel's failure to find a substitute choking and strangulation expert after the expert he had retained passed away. Although his trial counsel was able to submit the deceased expert's report into evidence and use the report to question the State's expert, Defendant argues that this was not as persuasive as a substitute expert's live testimony would have been.

---

(…continued)
Without knowledge of the circumstances surrounding how Defendant sustained his injuries, it is far from clear that the jury would assume guilt on the part of Defendant instead of feeling sympathy towards Defendant for being the victim of a shooting.

15. Defendant also makes fleeting mention of his trial counsel's failure to call non-expert witnesses to corroborate his account of what happened on the day of the assault. But he does not elaborate upon this argument—he does not identify any witnesses that his trial counsel should have called, nor does he describe how their testimony would have assisted his defense. Accordingly, we have no occasion to further consider this particular argument.

¶41 To succeed on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Reid*, 2018 UT App 146, ¶ 19, 427 P.3d 1261.

¶42 Without deciding whether his trial counsel's performance was deficient, we conclude that Defendant's claim fails because he has not established prejudice. To prove prejudice, Defendant bore the burden of "present[ing] sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (quotation simplified). Defendant has presented no such evidence. Instead, his prejudice argument is limited to the reiteration of the legal standard of the prejudice prong, stating that had his trial counsel called corroborating expert witnesses, "there was a reasonable likelihood of a different outcome." This does not satisfy the prejudice prong of *Strickland*. *See id.* ¶ 52 ("Merely repeating the legal prejudice standard is insufficient."). Accordingly, Defendant's ineffective assistance of counsel claim fails.

CONCLUSION

¶43 We conclude that the trial court did not abuse its discretion in ruling that the 404(b) evidence of other allegations of sexual assault against Defendant was not barred under rule 403. It likewise did not exceed its discretion when it denied Defendant's motions for a mistrial because the challenged testimony was made in passing and was relatively innocuous in the context of this case, and because the trial court took sufficient action to cure any potential unfair prejudice that Victim's improper testimony might have produced. Finally, because Defendant did not establish prejudice, his ineffective assistance of counsel claim fails.

¶44   Affirmed.

_____

HARRIS, Judge (concurring):

¶45   I concur in full in the majority opinion. My agreement with Sections II and III is enthusiastic. I have reservations about the analysis in Section I, but concur nonetheless for two reasons. First, Defendant did not raise or argue the issues that concern me, and therefore reversal in this case would not be appropriate. Second, and more substantively, I agree that the result the majority reaches in Section I is indeed driven by Utah Supreme Court precedent that this court is bound to follow, and the lead opinion ably describes that governing law and applies it to the facts of this case. I write separately to express my view—for whatever it might be worth—that the governing law might warrant re-examination in a future case. Specifically, I have concerns about the propriety of admitting, pursuant to rule 404(b) of the Utah Rules of Evidence, evidence of a defendant's prior bad acts under the "doctrine of chances" to rebut a defense of fabrication, and I wonder whether our law should either reconsider the conclusions reached in *State v. Verde*, 2012 UT 60, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016, or consider adoption of a categorical rule (akin to rule 413 of the Federal Rules of Evidence) that simply admits, in a more up-front way, evidence of similar crimes in sexual-assault cases that is typically being admitted anyway.

I

¶46   Anglo-American rules of evidence have long contained a general prohibition against the admission of evidence that a criminal defendant committed previous bad acts—separate from the crime with which he is charged—that are similar to the acts he stands accused of committing. *See, e.g.*, David P. Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events* § 1.2, at 2 (2009) (hereinafter "Leonard")

(stating that "[o]ne of the oldest principles of Anglo-American law is that a person should not be judged strenuously by reference to the awesome spectre of his past life," but instead by whether the person committed the specific acts with which he is charged (quotation simplified)). Utah's evidentiary rules are no exception: our rules state that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1).

¶47　This rule finds its origins not in logic, but in policy. *See People v. Zackowitz*, 172 N.E. 466, 468 (N.Y. 1930) (Cardozo, J.) (stating that the "principle" behind the ban on propensity evidence "is one, not of logic, but of policy"). Indeed, such evidence is excluded

> not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.

Leonard, § 1.2, at 6–7 (quoting 1 John H. Wigmore, *Evidence in Trials at Common Law* § 194, at 646 (3d ed. 1940)); *see also Michelson v. United States*, 335 U.S. 469, 475–76 (1948) (stating that propensity evidence is "not rejected because character is irrelevant," but because such evidence denies defendants "a fair opportunity to defend against a particular charge").

¶48　But this general historical rule is peppered with so many exceptions that it often gets lost in the shuffle.[16] Indeed, our rule

---

16. One case in point: the lead opinion in this case describes rule 404(b) as a rule of *inclusion*. *See supra* ¶ 27 (stating that rule

(continued…)

of evidence allows admission of evidence of a defendant's prior bad acts if such evidence is used "for another purpose" (other than demonstrating "that on a particular occasion the person acted in conformity with the character"). *See* Utah R. Evid. 404(b)(2). The rule even lists a number of possible "other purposes" for which prior bad acts evidence might be admitted, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* In this vein, our supreme court has stated that "[s]o long as the evidence is not aimed at suggesting action in conformity with bad character, it is admissible under rule 404(b)." *Verde*, 2012 UT 60, ¶ 15.

¶49 The difficulty, of course, lies in attempting to determine when evidence is offered for a permissible non-propensity purpose and when a party is merely attempting to dress up propensity evidence as something else in order to gain its admission. *See id.* ¶ 16 (stating that "it won't always be easy for the court to differentiate" between permissible and non-permissible prior bad acts evidence). Some jurisdictions, in a nod

---

(…continued)

404(b) "generally permits evidence of a defendant's other crimes, wrongs, or bad acts so long as the evidence has a probative value other than to show an evil propensity or criminal temperament" (quotation simplified)). The debate over whether the rule is exclusionary or inclusionary is an ancient one. *Compare* John Henry Wigmore, *Treatise on the System of Evidence in Trials at Common Law* § 193, at 231 (1904) (describing the rule as "a general and absolute rule of exclusion"), *with* Julius Stone, *The Rule of Exclusion of Similar Fact Evidence: America*, 51 Harv. L. Rev. 988, 990–91 (1938) (arguing that the rule is inclusionary, "excluding proof where the relevance was merely to the evil disposition of the accused"); *see also* David P. Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events* § 4.3, at 206–19 (2009) (discussing historical views of the rule).

to the difficulties inherent in trying to elicit such fine distinctions, have determined—through legislation, rulemaking, or common-law development—that at least some kinds of propensity evidence ought to be categorically admissible in sexual assault cases. About half of the fifty states have judicially recognized a common-law "lustful disposition" exception to the general ban on propensity evidence. *See* Basyle J. Tchividjian, *Predators and Propensity: The Proper Approach for Determining the Admissibility of Prior Bad Acts Evidence in Child Sexual Abuse Prosecutions*, 39 Am. J. Crim. L. 327, 338–39 & n.51 (2012) (listing the jurisdictions that have adopted this common-law exception). And some jurisdictions, most notably the federal courts through the enactment of rules 413 and 414 of the Federal Rules of Evidence, categorically allow the admission of prior bad acts in sexual assault cases. *See* Fed. R. Evid. 413, 414. Rule 413 covers "sexual assault" cases generally, and rule 414 covers "child molestation" cases. Each rule allows the court to "admit evidence that the defendant committed any other" sexual assault or child molestation, without regard to whether the evidence is offered for any of the rule 404(b)(2) purposes. *See id.* R. 413(a), 414(a); *see also* Michael L. Smith, *Prior Sexual Misconduct Evidence in State Courts: Constitutional and Common Law Challenges*, 52 Am. Crim. L. Rev. 321, 323–24 & nn. 6–21 (2015) (noting that a handful of states, including Utah, have implemented a version of one or both of these rules).[17]

---

17. These rules of evidence have generally been upheld against constitutional challenges, with courts noting that the continued applicability of rule 403 to all evidence admitted pursuant to these rules is an important factor in their constitutional validity. *See, e.g.*, *United States v. Coutentos*, 651 F.3d 809, 819 (8th Cir. 2011) (holding that rule 414 of the Federal Rules of Evidence was not unconstitutional); *United States v. LeMay*, 260 F.3d 1018, 1031 (9th Cir. 2001) (same); *United States v. Castillo*, 140 F.3d 874, 883 (10th Cir. 1998) (same); *see also People v. Falsetta*, 986 P.2d 182, 187–90 (Cal. 1999) (holding that California's version of rule 413

(continued…)

¶50 In 2008, Utah enacted a version of rule 414 of the Federal Rules of Evidence, and now categorically allows propensity evidence in child molestation cases, regardless of whether that evidence meets the requirements of rule 404(b)(2). *See* Utah R. Evid. 404(c) (stating that, "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged"). However, Utah has not enacted any version of rule 413 of the Federal Rules of Evidence, nor has it ever adopted any version of the "lustful disposition" exception, meaning that in cases where the defendant stands accused of sexually assaulting anyone who is fourteen years of age or older, there is no categorical rule allowing admission of that defendant's prior acts of sexual assault. Prosecutors attempting to introduce such evidence in adult sexual assault cases must demonstrate that the evidence they proffer meets the requirements of rule 404(b)(2).

II

¶51 A pair of leading commentators (including a Utah federal judge) have observed, in their treatise on the Utah Rules of Evidence, that "[i]f the prior bad acts involve sexual misconduct, or child abuse, or a combination of both, courts generally find a theory of admissibility, even if no specific theory of admissibility makes sense." *See* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 227 (2018–19 ed.); *see also* Kenneth J. Melilli, *The Character Evidence Rule Revisited*, 1998 B.Y.U. L. Rev. 1547, 1556 (1998) (hereinafter "Melilli") (stating that "creative prosecutors will usually be successful in generating a theory for introducing evidence of the defendant's prior, uncharged misbehavior before the jury"). One theory that—increasingly in recent years—has been harnessed for this

(…continued)
was not unconstitutional, in part because review for undue prejudice was still required).

purpose is a "theory of logical relevance" known as the "doctrine of chances" (the Doctrine). *See Verde*, 2012 UT 60, ¶ 47.

¶52 The Doctrine is controversial, *see* Melilli, at 1564 (referring to the Doctrine as "the real hinterland of Rule 404(b) metaphysics"), and a full discussion of its purposes and applications is beyond the scope of this opinion. As I explain below, I do not take issue here with the Doctrine's application in certain contexts (such as, for instance, to rebut a defense of mistake or accident), but I am unconvinced—for two reasons—of the wisdom of our supreme court's extension of the Doctrine to rebut fabrication defenses. First, I have doubts about whether the Doctrine can logically be applied in that context consistently with the historical propensity bar. Second, I wonder whether the Doctrine's application in this context runs afoul of the non-controversial principle that probability evidence is inadmissible to show that a witness is (or is not) telling the truth. I will discuss these two concerns, in turn, after a brief description of the Doctrine and its origins.

A

¶53 As described by our supreme court, the Doctrine is "a theory of logical relevance that rests on the objective improbability of the same rare misfortune befalling one individual over and over." *Verde*, 2012 UT 60, ¶ 47 (quotation simplified); *see also State v. Lopez*, 2018 UT 5, ¶ 52, 417 P.3d 116 (stating that doctrine of chances cases "involve rare events happening with unusual frequency"). At root, the Doctrine is simply "probability reasoning." *Verde*, 2012 UT 60, ¶¶ 50, 53; *cf. Hopt v. People*, 120 U.S. 430, 440 (1887) (referring to the "doctrine of chances" as a tool used to "establish a probability").

¶54 The Doctrine has been widely applied to rebut a defendant's claim that a series of extremely unlikely events are nothing more than coincidences or unfortunate accidents. There are several famous examples, including one first articulated in 1884 and quoted in *Verde*:

> Suppose you lose your horse; you find it in the possession of A.; he asserts that he took the horse by mistake; but you find that about the same time he took horses belonging to several others; would not the fact that he took others about the same time be proper evidence to be considered in determining whether the particular taking was or not by mistake? The chances of mistake decrease in proportion as the alleged mistakes increase.

2012 UT 60, ¶ 48 (quotation simplified). Similarly, in the case of the "Brides in the Bath," *Rex v. Smith*, 11 Crim. App. 229, 84 L.J.K.B. 2153 (1915) (also referred to in *Verde*, 2012 UT 60, ¶ 49), a defendant was accused of murder when three successive spouses died while taking a bath, and evidence of the circumstances surrounding the deaths of the other two spouses was admitted at the murder trial of the first spouse, for the purpose of showing the defendant had caused the first death. In another more recent example, multiple infants had died in their sleep while in the care of the defendant, and evidence of previous deaths was admitted to rebut the defendant's claim that the death in question was accidental. *See United States v. Woods*, 484 F.2d 127, 135 (4th Cir. 1973) (also cited in *Verde*, 2012 UT 60, ¶ 49). In these cases, the Doctrine did not function as an independent exception to the prohibition on character evidence; rather, its logic was used to explain the probative value of prior bad acts evidence that was introduced pursuant to other exceptions (usually to rebut a defense of mistake or accident) that are listed in rule 404(b)(2).

¶55   When applied to rebut a defense of mistake or accident, evidence of previous similar events is relevant not necessarily to show that the defendant had a propensity to commit similar crimes, but to show that it was practically impossible—as a matter of probability—for the events to have occurred accidentally as the defendant claimed. As our supreme court stated in *Verde*, "[p]ropensity inferences do not pollute this type

of probability reasoning," because "[t]he question for the jury is not whether the defendant is the type of person who, for example, sets incendiary fires or murders his relatives." 2012 UT 60, ¶ 50. Instead, "[t]he question is whether it is objectively likely that so many fires or deaths could be attributable to natural ca[u]ses." *Id.* This evidence "tends to prove a relevant fact without relying on inferences from the defendant's character," and is therefore not impermissible propensity evidence. *Id.* ¶ 51.

B

¶56     I have no quarrel with application of the Doctrine to rebut a defense of accident or mistake, because I agree that such application does not necessarily require the forbidden inference that a defendant has acted in conformity with his character or propensity. *Id.* ¶¶ 50–51; *see also* Andrea J. Garland, *Beyond Probability: The Utah Supreme Court's "Doctrine of Chances" in* State v. Verde *Encourages Admission of Irrelevant Evidence*, 3 Utah J. Crim. L. 6, 27 (2018) (criticizing our supreme court's application of the Doctrine in *Verde*, but acknowledging certain "proper uses" for the Doctrine, including application "to rebut claims of accident"). I cannot see how the same holds true, however, when the Doctrine is used to admit evidence to rebut a defense of fabrication.[18]

---

18. This application of the Doctrine, it bears noting, is not widely used. In *Verde*, our supreme court relied largely on one law review article and one concurring opinion from California in extending the Doctrine's application to fabrication defenses. *State v. Verde*, 2012 UT 60, ¶¶ 47–48, 296 P.3d 673. The court did state that "[m]any other courts have adopted the doctrine in these and similar contexts," *see id.* ¶ 53 & n.27, but none of the cases the court cited for that proposition actually applied the Doctrine to a fabrication defense; indeed, all but one of them applied the Doctrine in its traditional context: to rebut a defense of accident or mistake, *see Westfield Ins. Co. v. Harris*, 134 F.3d

(continued…)

¶57 The trigger for any application of the Doctrine is the occurrence of a "rare misfortune" that "befall[s] one individual over and over." *See Verde*, 2012 UT 60, ¶ 47. In applying the Doctrine to rebut a defense of accident, it is often easy to discern what the "rare misfortune" is—for instance, the death of a bride in a bathtub, or the mistaken taking of a horse. In applying the Doctrine to rebut a defense of fabrication, however, it is not as easy to discern what the "rare misfortune" is that triggers application of the Doctrine. As near as I can tell, the "rare misfortune" in this context must be either (a) that the defendant has been *falsely* accused of nonconsensual sexual assault on multiple occasions, *see id.* ¶ 45 (describing the State's argument

---

(…continued)
608, 615 (4th Cir. 1998) (stating that "the more often an accidental or infrequent incident occurs, the more likely it is that its subsequent reoccurrence is not accidental or fortuitous"); *United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991) (applying the Doctrine to rebut a defense of accident, stating that "the odds of the same individual reaping the benefits, within the space of three years, of two grisly murders of people he had reason to be hostile toward seem incredibly low, certainly low enough to support an inference that the windfalls were the product of design rather than the vagaries of chance"), *overruled on other grounds by Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999); *Wynn v. State*, 718 A.2d 588, 607 (Md. 1998) (stating that "[i]t is the objective implausibility of the occurrence, *sans* nefarious activity, which rebuts the claim of an innocent occurrence"); *State v. Johns*, 725 P.2d 312, 321–27 (Or. 1986) (applying the Doctrine to rebut a defense of mistake or accident); *see also People v. Everett*, 250 P.3d 649, 656–58 (Colo. App. 2010) (applying the Doctrine, based partly on statutory guidance, to rebut a defense of lack of consent). To my knowledge, very few other jurisdictions—in a reported majority appellate opinion—have applied the Doctrine to rebut a defense of fabrication. *E.g.*, *De La Paz v. State*, 279 S.W.3d 336, 347 (Tex. Crim. App. 2009).

as that it is "highly unlikely that three victims would independently fabricate similar accounts of unwanted sexual contact"), or (b) that the defendant has merely been accused—whether falsely or accurately—of nonconsensual sexual assault on previous occasions, *id.* ¶ 53 (stating that the Doctrine might be applied "based on the low probability that multiple victims would independently accuse the defendant of similar assaults"). Regardless of whether the triggering event is (a) or (b), the Doctrine doesn't seem to work in this context.

¶58 If the triggering "rare misfortune" is previous *false* accusations of sexual assault, one would expect the State—in order to properly invoke the Doctrine—to actually put on evidence of previous *false* accusations of sexual assault. But I have yet to find a doctrine of chances case in which any evidence was put on that, in previous cases, the defendant was *falsely* accused of sexual assault. (No prosecutor in her right mind would want to do such a thing, presumably because jurors might think that, if it happened before, it might have happened again.) Instead, in the typical case, the State seeks to introduce evidence that the defendant was *credibly* accused of sexual assault in previous cases. *See, e.g., id.* ¶¶ 6–9; *State v. Balfour*, 2018 UT App 79, ¶¶ 31–33, 418 P.3d 79, *cert. denied*, 429 P.3d 465 (Utah 2018). As a matter of logic, then, if the State seeks to introduce evidence of previous *true* accusations of sexual assault pursuant to the Doctrine, the triggering event of "rare misfortune" cannot possibly be the fact that the defendant was *falsely* accused of sexual assault in previous cases.

¶59 But using previous accusations—regardless of their truth or falsity—as the "rare" triggering event also suffers from logical problems. If one assumes that the accusations are true, and that the defendant actually committed the previous sexual assaults, it becomes extremely difficult to distinguish such evidence from straight-up propensity evidence. *See* Melilli, at 1568 (pointing out that "the explanation for the [Doctrine] in the multiple-accusers context is simply a convoluted explanation of the general propensity inference," because "[e]ach separate accusation

would have no bearing upon the accuracy of another allegation but for the conclusion that the multiple accusations demonstrate a cross-situational pattern of behavior, which is but a variation on the taboo inference of a general propensity or character trait"). And if one stops short of assuming that the accusations are true, and simply uses accusations—regardless of their truth or falsity—as the "rare" triggering event, that brings its own set of logical problems. As one commentator astutely points out, there is "something awry with rules of evidence that permit the trier of fact in a rape case to infer guilt based merely on prior accusations of rape, but, at least in principle, ordinarily will not allow the trier of fact to infer guilt based on the fact that the accused is actually guilty of rape on prior occasions." *Id.* at 1566.

C

¶60     The other problem I see with application of the Doctrine to rebut a defense of fabrication is that such application allows the introduction of probability evidence for the avowed purpose of demonstrating that the complaining witness is more likely to be telling the truth. Our law allows such evidence in no other context, and it does not appear that our supreme court has ever examined the extent to which *Verde* is inconsistent with its other jurisprudence around this issue.

¶61     Decades ago, in *State v. Rammel*, 721 P.2d 498 (Utah 1986), our supreme court drew a hard line regarding the admissibility of probability or statistical evidence to speak to a witness's credibility. In that case, the credibility of the prosecution's star witness was at issue; that witness was telling a different story at trial than he had told in his first interview with police. *See generally id.* The prosecution attempted to shore up the witness's credibility by calling a police detective to testify that, in his experience, it was not unusual for individuals to lie the first time they met with police. *Id.* at 500. The trial court allowed the testimony, but the supreme court reversed, for three reasons.

¶62    First, the court noted that, "[a]lthough a witness's credibility may always be impeached, the impeaching evidence must go to *that* individual's character for veracity," and probability evidence does not go to a particular individual's character for truthfulness. *Id.* Second, the court determined that the police officer did not have "foundation" to testify anecdotally about the probability of people telling the truth. *Id.* at 501. Third, and most relevant here, the court held as follows:

> Even where statistically valid probability evidence has been presented—and [the officer's] testimony hardly qualifies as such—courts have routinely excluded it when the evidence invites the jury to focus upon a seemingly scientific, numerical conclusion rather than to analyze the evidence before it and decide where truth lies. *Probabilities cannot conclusively establish that a single event did or did not occur and are particularly inappropriate when used to establish facts not susceptible to quantitative analysis, such as whether a particular individual is telling the truth at any given time.*

*Id.* (emphasis added) (quotation simplified); *see also State v. Burnett*, 2018 UT App 80, ¶ 36 n.9, 427 P.3d 288 (citing *Rammel*, and determining that statistical evidence of probabilities that a particular witness was telling the truth was inadmissible).

¶63    As noted above, the Doctrine is simply a "probability theory" that speaks to the likelihood of a particular "rare" event occurring repeatedly. *See Verde*, 2012 UT 60, ¶ 47. When the Doctrine is used to rebut a defense of fabrication, the prior bad acts evidence is admitted precisely because that evidence makes it more likely, from a probability standpoint, that the complaining witness is telling the truth. I cannot see a principled way to reconcile *Rammel*'s rule forbidding the introduction of probability-based evidence in this context with *Verde*'s application of the Doctrine to allow it.

III

¶64 In the case before us, the trial court allowed three witnesses to testify that Defendant sexually assaulted them on previous occasions and, in addition, the court allowed a statistician to testify that there is a 0.0004 percent chance of a person being arrested even once for rape or attempted rape in Utah, and that the chances of such a thing happening to the same person four times was 1 in 16 trillion. The trial court admitted this evidence pursuant to the Doctrine, because the State offered it, in part, to rebut Defendant's claim that Victim had fabricated her account of the events in question. In this opinion, we affirm that decision, and I concur in that result because Defendant does not ask us to re-examine the applicability of the Doctrine in this context and, in any event, we are bound to follow the analysis set forth in *Verde*.[19]

¶65 But I have reservations about employing the Doctrine, in a case like this, to admit evidence of Defendant's prior bad acts. For the reasons set forth, I wonder whether application of the Doctrine in this context might warrant re-examination,

_____

19. I also concur with the majority's conclusion that the trial court did not abuse its discretion in balancing the contested evidence's probative value with its potential for unfair prejudice. In such situations, a trial court must conduct a separate rule 403 analysis, and may not simply conclude—based solely on a determination that there is a proper non-character purpose for the evidence—that the evidence is admissible. *See supra* ¶ 28 (describing the "three-step analysis" that a court must take, with the third step being rule 403 balancing). In this case, although the trial court discussed some of the doctrine-of-chances factors in connection with its rule 403 analysis—something it is allowed to do, *see State v. Lowther*, 2017 UT 34, ¶¶ 29, 41, 398 P.3d 1032—it did not limit itself to those factors, and conducted a separate analysis of whether the evidence's probative value was substantially outweighed by the risk of unfair prejudice.

specifically regarding whether such application is at odds with the historical ban on propensity evidence as well as the longstanding rule against admission of probability evidence to speak to a witness's credibility. Decisions about whether to re-examine *Verde*, or to enact a version of rule 413 of the Federal Rules of Evidence—two very divergent pathways—will be made above my pay grade. But I have concerns about whether we can or should continue down our current path, in which we routinely "allow[] character evidence to reach the jury while maintaining the pious fiction that we follow the character evidence rule." *See* Melilli, at 1569.

———————